[Crim. No. 6272. Second Dist., Div. Three. Dec. 21, 1959.]

THE PEOPLE, Respondent, v. LEONARD EWING SCOTT, Appellant.

Morris Lavine for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, William B. McKesson, District Attorney (Los Angeles), Manley J. Bowler, Chief Deputy District Attorney, J. Miller Leavy, Arthur L. Alarcon, and Lewis Watnick, Deputy District Attorneys, for Respondent.

SHINN, P. J.—L. Ewing Scott was convicted of the murder of his wife Evelyn, who disappeared from her home May 16, 1955. He was indicted by the Los Angeles County Grand Jury in October, 1956, for murder, for nine offenses of forgery and four offenses of grand theft. The count charging murder was tried; the others were removed from the trial calendar and were not tried. The trial to a jury resulted in a conviction of murder of the first degree and .pursuant to a verdict fixing the penalty appellant was sentenced to life imprisonment. He appeals from the judgment and an order denying his motion for a new trial.

The principal contention is that there was insufficient evidence to establish the corpus delicti. The evidence was wholly circumstantial. It is not claimed that in a trial for murder the death of a missing person and the use of criminal means to accomplish death cannot be proved by circumstantial evidence, provided it is sufficient to preclude every reasonable theory of innocence of the accused. The principle is well established. If it were not so we would have to hold the evidence insufficient to support the verdict.

Mrs. Scott simply disappeared from her house, dropped out of sight, and has not been heard from. There was no evidence of violence or other means of death used upon her and no body, or part of a body has been found. Appellant did not testify at the trial. His only explanation of his wife's disappearance has been that she left home in her car about 4:30 p.m. during his temporary absence and that he has not seen or heard from her since that time. He asks where is there evidence as to when she died, where she died and how she died, or that she is dead. The People reply that the answers to these questions are to be found in a multitude of circumstances developed by the testimony of many witnesses and reported in some 6,000 pages of the reporter's transcript.

The case in hand is without precedent in this country. There is no reported case from our state or federal courts that in its facts bears close resemblance to the present one. For that reason we shall not abbreviate our statement of the evidence nor our analysis of it. In some respects the evidence was cumulative, but properly so. The jurors no doubt gained a better understanding of many occurrences and conditions described in detail by numerous witnesses than could have been conveyed to them by mere generalizations of only a few.

The theory of the People can be stated as follows: It would be utterly unreasonable to believe that Mrs. Scott would have run away from her home, her husband and her friends; it would have been an irrational thing for her to do. If it was unreasonable to believe that she would have left home voluntarily that would have been a circumstance tending logically to prove that she did not leave of her own accord. The People's theory then proceeds to the activities of appellant both before and after his wife's disappearance. It is contended that the evidence proved that he had a motive for doing away with his wife, he coveted her large estate, attempted to prepare her friends for an explanation of her disappearance at some future time, was pleased and satisfied when she disappeared, did everything in his power to deceive her friends and the authorities in order to prevent an investigation, promptly set about through forgeries and thefts to steal her property, and fled the country when he feared that he would be charged with her murder. Thus the evidence was centered in proof of the characters, the motives and the activities of two persons. More precisely, it was centered in proof of their respective states of mind which would tell whether Mrs. Scott had a reason or purpose for running away, whether appellant had a motive and a plan for making away with her and whether he knew after the 16th day of May, 1955, that she was dead.

Mrs. Scott was 63 years of age. Her marriage to appellant was her fifth. Her first husband was a Mr. Kiernan from whom she was divorced. She married a Dr. Lewis whom she also divorced. In New York she married Clement Pettit and came to California with her husband, taking residence on San Rafael, in Pasadena. Mr. Pettit passed away and Evelyn married Norris Mumper who soon suffered a fatal heart attack. In 1949 she married appellant in Nevada. The San Rafael residence was sold to Hewlings Mumper, brother of Norris, and the Scotts moved to Bel Air, on Bentley. At the time

of her marriage to appellant Evelyn had an estate of the value of some $400,000, consisting of property in Milwaukee and securities worth about $190,000. Her yearly income was around $20,000. A few years after her marriage to appellant she converted securities worth in excess of $200,000 into cash and made no new investments. Her income thereafter was from her Milwaukee property and amounted to about $17,000 a year. Appellant, who was not a man of means, and was without income, depended upon his wife for support.

There was evidence of physicians and friends that Mrs. Scott was in good mental and physical health; she was intelligent, gay, devoted to many fine friends, leading a tranquil domestic life, possessed of a more than ample estate and income and quite satisfied with her way of life. The evidence tended to prove that if she went away it was without preparation, without money or extra clothing and leaving behind two pairs of eyeglasses and a denture which she habitually wore, and which were subsequently found on adjoining property buried under leaves and ashes. With respect to the conduct of appellant after his wife's disappearance it is contended that his attempts to frustrate an investigation and his every act and statement proved beyond question that he knew his wife was dead.

We shall state first the evidence which the People contend demonstrated the extreme improbability that Mrs. Scott would have voluntarily left her home, her husband and her friends. Evidence was received of many significant facts which had direct bearing upon that question. The jurors heard the testimony of physicians and many of Mrs. Scott's intimate friends, including those who were familiar with her business transactions and capabilities.

There was medical testimony with respect to Mrs. Scott's mental and physical health. Dr. Purcell Schube, a psychiatrist-psychologist, was consulted by Mrs. Scott in June of 1945, soon after the death of Mr. Pettit. She visited him intermittently but never exhibited evidence of psychosis or neurosis; she came to him only to discuss matters which caused her anxiety after the death of Mr. Pettit and the later death of Mr. Mumper. He found her at all times to be highly intelligent and a healthy woman.

Dr. John E. Wirth testified that in 1947 he removed a skin cancer from the face of Mrs. Scott and also a papilloma from her cheek; one was benign, the other malignant. In 1950 he removed a benign lesion from her left eyelid. In March 1950

a slightly brown pigmented area was removed. There were somewhat similar treatments up to July 1954 for mere thickening of the skin. There was nothing at all serious in the conditions for which Mrs. Scott was treated.

Dr. Rudolph Schindler, a specialist in internal medicine, testified that Mrs. Scott first consulted him in April 1952, complaining of abdominal pains. Her condition was diagnosed as diverticulosis and one which because of lack of inflammation was a minor ailment not acute enough to become diverticulitis. In other respects, Mrs. Scott was in sound physical health. She was given medication and the treatment administered was successful. At intervals to the month of February 1955, Dr. Schindler gave Mrs. Scott physical examinations and in March 1955 he removed a small polyp which was benign; it was a very minor operation which did not require anesthesia. In Dr. Schindler's opinion Mrs. Scott was an exceptionally intelligent woman, unusually sensible, reasonable, quiet, ladylike and cooperative. She was mentally healthy and well poised; in March 1955, she was a perfectly healthy woman.

Numerous witnesses testified to Mrs. Scott's character, the many close friendships she enjoyed and to her apparent satisfaction with her way of life.

Among Mrs. Scott's most intimate friends was Mrs. Mildred Schuchardt whose acquaintance with her commenced in 1935 when Mr. and Mrs. Schuchardt and Mr. and Mrs. Pettit took a trip abroad together. A fact that brought the two families closer together was that both Mr. Pettit and Mrs. Schuchardt suffered from arthritis and frequently discussed their problems. After the European trip the friendship of Mrs. Schuchardt and Mrs. Scott grew stronger. They attended many functions together and exchanged parties and dinners. Telephone conversations between them were of almost daily occurrence. Mrs. Schuchardt's last conversation with Mrs. Scott was by telephone on May 4, 1955. Mrs. Scott said nothing about taking a trip and stated that as for living abroad she would be unhappy to be away from her friends. Mr. Schuchardt testified that he had known Mr. Pettit for 40 or 45 years. In 1945 he and Mrs. Schuchardt went with Mrs. Scott to Mexico where they visited for a couple of weeks. They continued to visit with Mr. and Mrs. Scott.

George Wallace Bone, a retired airline executive, a close friend of the Schuchardts, became a friend of the Scotts,

attended social functions with them and each year received Christmas cards from them.

Marguerite Watson had known Mrs. Scott for some 35 years and their friendship grew stronger throughout the years. After the marriage to Mr. Pettit, she visited with them socially and after the Pettits moved to Pasadena she and Mrs. Scott corresponded about once a month. About 15 years ago, the Watsons experienced financial hardship, due to Mr. Watson's illness. Mrs. Scott sent them clothing she was discarding and sent two checks of $25 each as birthday gifts for Mrs. Watson's sister, and in August 1954 sent a check of $100 for the same purpose. With more or less regularity Mrs. Scott sent articles of clothing to Mrs. Watson's housekeeper for any use that might be made of them. In May 1955, she sent Mrs. Watson a stole. Mrs. Watson wrote a letter of thanks but received no reply. To a later letter she received a reply from appellant which will be mentioned in another connection.

Gertrude Parmentier who had known Mr. Pettit for many years, met Mrs. Scott when the Pettits came to California and they saw each other frequently. They visited together both before and after Evelyn's marriage to Scott. Mr. Parmentier's testimony was similar to that of his wife.

Opal Mumper, a sister-in-law of Norris Mumper, had known Mrs. Scott since 1947. A close friendship existed between them through the years. They visited together frequently.

Mrs. Gladys Baum knew Mrs. Scott when she was Mrs. Pettit and saw her at least once a week and sometimes every day. They frequently met on social visits, at luncheons and dinners. After the death of Mr. Mumper, Mrs. Scott went with Mr. and Mrs. Baum to New York where they had photographs taken which they exchanged. After Mrs. Scott married appellant, Mrs. Baum saw her on an average of once a week and they communicated every few days by telephone. May 14, 1955, Mrs. Baum entertained the Scotts at dinner in celebration of Mrs. Scott's birthday. On that occasion Mrs. Scott said that she was feeling "especially well." Mrs. Baum loaned Mrs. Scott a book.

William H. Brawner, a lawyer, became acquainted with the Pettits when they built on adjoining property in 1935. Mrs. Brawner and Mrs. Scott were close friends and visited each other with great frequency, attending parties at the Pettit home about once a month. Mr. Brawner had known appellant since early in 1949. Mr. Brawner attended a birthday dinner

May 11 or 12, 1955, given by Mrs. Scott. He had talked with her many times in previous years when they discussed securities and investments. On the night of May 12, Mrs. Scott seemed constrained and reserved but told Mr. Brawner that she had never felt better.

Mrs. Gertrude L. Brawner, Mrs. Scott's next-door neighbor on San Rafael, testified that in addition to their visiting she and Mrs. Scott corresponded by mail when either was out of the city and when both were home would communicate by telephone two or three times a week.

Eleanor Waller knew the Pettits in New York and went out with them socially several times a week. Mr. Pettit was the godfather of her son. After the Pettits left New York in 1935, Mr. Pettit sent her son a check every Christmas and birthday and after Mr. Pettit died Mrs. Scott continued the practice, usually sending a note or letter even when she was abroad. She also acknowledged the Wallers' anniversary with a card or letter. At Christmastime in 1954, Mrs. Waller received a Christmas card and a check. After the Pettits came to California she corresponded with Evelyn about once every six weeks or two months and when Evelyn visited in the East she would stay with the Wallers. The last letter from Mrs. Scott was received in March 1955.

Mrs. Mayella Frederick had known Mrs. Scott since 1917. When the Pettits moved to Pasadena, Evelyn and she corresponded four or five times a year and each Christmas she received a card and checks ranging from $15 to $25. The last letter she received from Mrs. Scott was dated March 30, 1955.

Marion Bradley had known Mrs. Scott for at least 20 years while she was married to Mr. Pettit and during her marriage to Mr. Mumper. They were close friends, visited each other and attended many social functions together through the years. Shortly before Mrs. Scott's birthday May 11, 1955, Mrs. Bradley had sent her flowers and received a note of thanks.

Norman Duncan served as butler-bartender for Mrs. Scott when she was Mrs. Mumper and later after she married appellant. His services ran through the years 1948, 1949 and 1950. During the same period he served for friends of the Scotts when Mrs. Scott was present.

Olive Wright worked for Mrs. Scott as housekeeper for about 11 months in 1948 and 1949.

James B. Boyle, an attorney of Pasadena, had been Mr. Pettit's attorney and later attorney for Mrs. Scott. He attended to the settlement of Mr. Pettit's estate through which

Evelyn acquired a 9/16ths interest in an apartment building in Milwaukee. He prepared Mrs. Scott's income tax returns each year. She made separate returns and told him Mr. Scott had no income. Mrs. Scott took a number of trips out of the country but always informed Mr. Boyle of her intended trips. Usually when she left the city she informed Mr. Boyle of her plans or wrote to him giving her itinerary. Many times throughout their acquaintanceship Mr. Boyle attended social functions at Evelyn's home on San Rafael and at the Bentley home.

Mrs. Vera Landry served as cook for Mrs. Scott at the San Rafael residence for a year and two months and for one month at the Bentley address. Shortly after the Scotts returned from their honeymoon, Mrs. Landry noticed Evelyn's face was bruised. During the night she had heard the sound of a falling object coming from the Scotts' bedroom. In explanation appellant told Mrs. Landry what happened stating ''Well, I just slapped the wind out of her.'' Mrs. Scott said she had tripped and fallen. Appellant insisted that Mrs. Landry listen in upon Evelyn's telephone calls and showed her how it could be done. Mrs. Landry refused. After the third request, accompanied by the threat of being discharged, Mrs. Landry quit. On one occasion appellant told her that he was not in love with Mrs. Scott and that his marriage was ''just one of those things.''

The witnesses we have named and other intimate friends testified at length to Mrs. Scott's excellent character, manner, habits and deportment. None had seen anything to indicate that she was not physically and mentally well or that she was worried or fearful for her health. All testified to her great personal charm, her quiet demeanor, her poise, her affection for her friends and her apparent satisfaction with the conditions under which she was living. All the many friends who had observed Mrs. Scott's demeanor at social gatherings where liquor was served testified that she never overindulged and was scarcely ever known to take more than a single drink. Their testimony established that her life was largely devoted to the interests of her friends and that her friendships were constant, intimate and enduring. None of them testified to any reason or circumstance indicating that Mrs. Scott was unhappy. Aside from the loss of her husbands, so far as shown, she had suffered no misfortune nor any experience that would have caused her worry or grief. She had expressed to no one any intention to leave home nor any desire to separate from

her husband. All the friendships described in the evidence continued without interruption to the day of Mrs. Scott's disappearance.

From the estates of her husbands, Evelyn had acquired a considerable estate which produced an ample income. From her Milwaukee property alone she had an income which averaged $1,400 a month. She was shown to have a better than average understanding of her investments. Through Norris Mumper she became acquainted with J. Smith Miller, an investment counselor, and in 1947 employed his firm of Willis and Christy as her counselors for a period of a year. Her securities at that time were valued at $183,059.54. Throughout the following year Mr. Miller had conferences with Evelyn lasting from two to four hours and when their relationship was terminated in April 1948, her securities were valued at $191,457. Mr. Miller testified that she was of above average intelligence in financial matters and had an excellent understanding of the subjects they discussed. .

John Connell, of Loomis-Sayles Investment Counselors, took over the account in 1948 and held it until June of 1951. He had many meetings with Mrs. Scott prior to her marriage to Scott, after which his discussions were with Scott by telephone or in person. His employment was terminated in June 1951. Mrs. Scott appeared to have an understanding of investments but after her marriage to Scott seemed to follow the latter's advice. In June 1951 her holdings were valued at $209,000.

We have previously mentioned the significant fact of the discovery by the police of certain articles, including two pairs of eyeglasses and a denture containing five teeth, which Mrs. Scott had used for a number of years and continuously up to the time of her disappearance.

On March 8, 1956, with the consent of appellant and his attorney, Captain Hertel of the Los Angeles Police Department and others made a search of the premises at 217 North Bentley. The ground was probed with 6 foot steel rods. The hillside property to the north is uncultivated and not landscaped. It is heavily covered with brush, grass and shrubbery. It is separated from the Scott property by a wall. In searching this area it was necessary to break away branches of brush. In probing with his hands underneath the leaves, Captain Hertel found a denture and a quantity of tablets, small quantities of yellowish powder, the remains of gelatin capsules, an empty can of Eff-Reimin tooth powder, a large quantity of

cigarette filters, a cigarette holder and a tube labeled "Ultrasol home hair treatment." The denture was found buried under 4 or 5 inches of leaves and was encrusted with dirt. One pair of eyeglasses was found beyond the retaining wall about 10 feet from the Scott incinerator. Another pair was found partially imbedded in a heap of ashes about 10 feet further to the west. Both pairs were encrusted with dirt, mud and ashes. In order to reach the area where the glasses were found it was necessary for Captain Hertel to crawl some 20 feet upon his hands and knees. While the area was being searched appellant appeared upon the balcony and inquired "What are they doing down there?"; the search was temporarily discontinued. All these articles were in such condition that fingerprints would have been obliterated. At that time appellant was asked the names of Mrs. Scott's dentist and oculist and professed ignorance of their names. In the fire box and ash box of the incinerator were found 20 hose fasteners usually present on women's garments, two small metal belt buckles and small fragments of a thin blackish fabric. Some of the material recovered by Captain Hertel was found to be aureomycin that had been heavily weathered. Also found was a quantity of sulfa thalidine containing fine particles of soil and vegetable debris. The denture and the eyeglasses were proven to be those of Mrs. Scott. "Ultrasol" was a preparation which she used at home. She also smoked cigarettes with a black holder.

Dr. Harold E. Mulligan, an opthalmologist, testified that he had prescribed glasses for Mrs. Scott in 1941 and again in November 1946; the last prescription was for reading glasses and not bifocals. Without her glasses Mrs. Scott would not have been able to read the grand jury transcript as close as about 20 inches. Two pairs of glasses were brought to him by a Captain Hertel of the Los Angeles Police Department March 15, 1956; both pairs had the exact prescription given Mrs. Scott in November 1946. It is not unusual for prescriptions of 1946 to be satisfactory in 1955; the prescription of 1946 was of such strength as to leave no need for stronger glasses. The eyeglasses were identified by the witness and received in evidence.

Dr. Albert Chatton testified that he made the glasses according to Mrs. Scott's prescription and on April 27, 1955, put the lenses into a new frame. The frame shown him was identified by Dr. Chatton as the frame last described. Both pairs of glasses corresponded with the two prescriptions given by Dr. Mulligan. The frames delivered to Mrs. Scott

April 29, 1955 were of clear crystal. Time alone, weather, heat or sunshine would have changed the frames to their yellow hue.

Spencer R. Atkinson, an orthodontist, had had Mrs. Scott as a patient since October 1944. At that time four of her upper anterior teeth were loose and to save them a retaining appliance was made in July of 1947 and changed again July 1, 1952. Dr. Atkinson last saw Mrs. Scott January 18, 1955. The retaining device could not be worn with the denture. It had to be worn at night; its purpose was to keep the front teeth from spreading and elongating, in which it was successful. If she had not worn the device she would have lost her teeth.

Dr. Reginald L. Coldwell took Mrs. Scott as a patient in June 1941. She was then wearing an upper removable denture on which he replaced the first bicuspid. He made a new denture for her July 19, 1943, the technician being Paul Ungerer. This contained five teeth. It was examined from time to time and kept in proper condition. May 13, 1955, Mrs. Scott visited Dr. Coldwell. She had her teeth cleaned and was wearing the denture he had made; she had never been to his office without the denture. The one found by Captain Hertel was identified by Dr. Coldwell and also by the dental technician Ungerer, as the denture that had been made for Mrs. Scott in 1943.

The evidence with respect to appellant's finances was the following: On January 28, 1944, he and his mother, Margaret C. Scott, opened an account with the Ambassador Branch of the Security First National Bank with a deposit of $800; the account was closed January 3, 1950, by withdrawal of the balance of $100.41. Under the heading "occupation" there was written on the card the word "none." On July 8, 1948, appellant and his mother opened another account at the 7th and Grand Branch of the Security Bank with a deposit of $15,857.50. The signature card listed appellant as "promotor." The account was closed October 27, 1950 with a withdrawal of the balance of $234.61. Appellant opened an account of his own with Bank of America, 7th and Flower Branch, October 26, 1950, with a deposit of $1,670; the account was closed February 17, 1954, by withdrawal of $262.44. Between December 15, 1950 and July 12, 1951, deposits were made to the amount of $4,365.73. From an analysis of bank records, it appeared that sums in this amount had been received by appellant from Evelyn. Aside from the joint bank

account with his mother which was closed at the time appellant deposited in a new account of his own $1,670, appellant, so far as shown, owned no property other than an automobile and his personal belongings. There was no evidence that he had any occupation other than his voluntary assumption of the management of his wife's property. He had no income of his own and filed no income tax returns. He lived at the expense of his wife.

Soon after appellant married Evelyn he assumed complete control over her finances. At the time of the marriage Evelyn maintained a brokerage account with E. F. Hutton and Company and owned securities of the value of about $180,000. Mr. Connell of Loomis-Sayles Investment Counselors took charge of Mrs. Scott's account in 1948. Because of a disagreement with appellant over investment policies the employment of Loomis-Sayles was terminated in June of 1951 when the holdings were valued at $209,000. Appellant stated to Mr. Boyle that he could do a better job than Loomis-Sayles could do; that he had formerly been in the subdivision business and was familiar with investments. There was no evidence that after appellant assumed control of his wife's affairs any investment was made. The Milwaukee property in which Mrs. Scott owned a 9/16ths interest was under the management of Wisconsin Trust Company. Appellant went to Milwaukee, caused the termination of that employment and placed the management with Ogden and Company under a contract written in 1954. Thereafter, all contacts were between Ogden and Company and appellant. The correspondence between them was voluminous and continued after the disappearance of Mrs. Scott, of which appellant made no mention. A representative of Ogden and Company produced the checks written in favor of Mrs. Scott after her disappearance, upon all of which her endorsement had been affixed by means of a rubber stamp for deposit to her account.

At various times in 1952, 1953 and 1954, appellant stated to Mr. Brawner that he was urging his wife to convert her securities into cash; he discussed the prospect of their going to Portugal to live, saying that they could do much better there. Upon the occasions of these discussions with Mr. Brawner, Mrs. Scott stated that she preferred to live in the United States, that she did not care to sell her securities, but that she had consented to sell them in order to keep peace with her husband. Appellant told Mr. Boyle that he was advising his wife to sell her securities, but in her discussions

with Mr. Boyle Mrs. Scott said that she was doing so only because of appellant's urging. Appellant insisted that Boyle should agree with him. On May 12, 1955, at a dinner party appellant stated to Mr. Brawner that his wife had placed the money received from her securities in a safety deposit box and that this had been done on his advice. Upon more than one occasion he stated to Mr. Boyle in the presence of his wife that he believed there was danger from atomic bombs and that it would be advisable to place the proceeds from the sale of the securities in various banks throughout the country. Boyle expressed the opinion that it would be an unnecessary precaution. On New Year's Day of 1955, at a party given in the Scotts' home appellant told Mr. and Mrs. Baum that it was a good time to liquidate holdings, that Mrs. Scott had sold her securities upon his advice and had retained the proceeds in the form of cash. Mrs. Scott stated that she had sold her securities upon appellant's advice. In these discussions no one to whom appellant's statements were made expressed agreement with them.

It may be mentioned at this point that during this interval Mrs. Scott commenced a practice of withdrawing large sums of money from bank accounts, cashing E Bonds and making frequent entries into her safety deposit box. Between June and December 1952 she withdrew money from banks on 56 occasions. On 39 of these occasions she entered her safety deposit box. Thereafter and until August 1954, she made nine withdrawals and eight entries into her safety deposit box. She also cashed some E Bonds. Between June 18, 1952 and March 26, 1953, Mrs. Scott withdrew from Hutton and Company $85,000 in 17 checks of $5,000 each.

The withdrawals from banks, the cashing of the E Bonds and three checks from the Wisconsin Trust Company totaled $57,177.74. All Mrs. Scott's bank accounts were analyzed by a Mr. Doherty who testified that none of the mentioned withdrawals, proceeds of bonds sold or checks could be traced to any other account of Mrs. Scott, to any other person, or the payment of any bills or other disbursements. This amount could only be accounted for as having been placed in the safety deposit box. On September 9, 1954, Mrs. Scott purchased 10 travelers checks at $50 each and 10 of $100 each. In March 1955 she purchased 8 other travelers checks of $100 each. During 1954 and 1955, she withdrew from her bank accounts $100,000 and deposited sums of $10,000 in each of

10 banks outside California. At the time of her disappearance she had accounts in Los Angeles banks with balances of $65,844.25 which included an account at the Santa Monica Branch of the Bank of America with a balance of $3,244.

Upon numerous occasions, long before Mrs. Scott disappeared, appellant made statements to her friends that she was seriously ill. Mr. and Mrs. Brawner were next door neighbors of the Pettits and the Scotts on San Rafael for several years and as previously stated they were frequently with Mrs. Scott and on intimate terms of friendship with her. Mr. Brawner testified that through 1954 and up to the time of Mrs. Scott's disappearance on almost every occasion when the families met at parties, appellant would say out of his wife's hearing: "Mrs. Scott is in terrible shape. I had an awful time last night with her." This happened on many occasions. But on those occasions Mr. Brawner observed that Mrs. Scott appeared to be in excellent health. At a party on the night of May 12, 1955, appellant told Mr. Brawner that his wife had been very ill on the previous night and that he was going to have to take her home.

On April 3d or 4th Mrs. Mumper called the Scott residence and talked with appellant, who told her Evelyn was shopping in the village. She asked how Evelyn was and appellant replied "Terrible, just terrible" and when asked what the trouble was replied "Well, various things." He warned Mrs. Mumper not to tell Evelyn of their conversation. On the following day Mrs. Mumper called Evelyn and inquired as to her health. Evelyn said she had had a checkup with X-rays and everything was fine, that she felt fine; all she had to do was keep to her diet, which was not strenuous.

The evidence of the statements and actions of appellant after May 16th shed light upon his character, his motives and especially upon his state of mind. He, alone, knew whether Mrs. Scott met her death the night of May 16th. In his knowledge of what took place that night lay the answer to the entire case. Every circumstance in evidence respecting the conduct of appellant tended in some degree to shed light upon the question whether he believed his wife would return, or knew she could not return. There were many incidental questions to be answered. What did the evidence tend to prove as to appellant's character? Would he have been capable of taking the life of the woman who had been his wife for six years? Why would he have wanted to be rid of her? What were the reasonable deductions from his con-

duct after May 16th with respect to his state of mind? Did it indicate that he knew his wife was dead? Presumably the jury gave answers to these questions that were unfavorable to appellant.

On the afternoon of May 16, 1955, Mr. and Mrs. Scott took a demonstration ride in a car with a salesman named Quast. They were considering purchasing a car for delivery in Europe and they discussed with the salesman living conditions abroad and the possible renting of a house in Spain or Portugal. After the 16th, when the salesman contacted Scott he was informed that they had given up the thought of buying the car. Next to appellant, Mr. Quast was the last person to see Mrs. Scott.

Mrs. Scott was most particular of her personal appearance and kept regular weekly appointments at a beauty shop. On the morning of May 17th, by telephone from an unidentified source, her appointment for that day and all future weekly appointments were cancelled. On May 26th, appellant wrote to an insurance broker through whom a policy had been issued covering Mrs. Scott's jewelry cancelling the insurance on about $6,500 of her jewelry and directing the coverage of certain articles of men's jewelry. These instructions were to be effective as of May 17th and were duly carried out by the broker. On May 19th, appellant forged Mrs. Scott's name to a signature card giving him access with his wife to her safety deposit box in the Security First National Bank, Westwood Branch. He encountered some difficulty in accomplishing this but persuaded the bank officials to accept the card without Mrs. Scott's presence, asserting that she was ill and unable to appear at the bank. He entered the box and took it to a private room for examination. The box was thereafter opened in March of the following year when it was examined by the authorities. Aside from some small articles of jewelry it contained nothing but two sealed envelopes filled with sand. Upon analysis by Ray Pinker, police chemist, the sand was found to be identical with plaster sand and a pile of common sand found at the Scott residence. It contained no mineral of value.

On June 1st, appellant opened an account with the Van Nuys Branch of the Bank of America with a deposit of $400 in $50 bills. It was opened as a joint account of appellant and Evelyn Scott. Mrs. Scott's name on the signature card had been forged by appellant. He caused a rubber stamp to

be made with Mrs. Scott's name. Using this he deposited checks from Ogden and Company.

On May 23d, appellant opened an account in his own name in the Bank of Los Angeles with a deposit of $500. On June 1st, he deposited in the account a check for $225 and a $100 travelers check; on June 3d, he deposited $50 in currency and a $100 travelers check; later he deposited in this account seven travelers checks for $100 each and one for $50; between October 31, 1955 and November 11, 1955, he deposited five travelers checks of $50 each. Altogether he forged Mrs. Scott's name and cashed 23 travelers checks amounting to more than $2,000. On June 29th, there was withdrawn from Mrs. Scott's account in the Santa Monica Branch $3,244 and on the same day a deposited of that amount was made in the Van Nuys bank together with a travelers check for $100. The total amount of deposits in this account was $19,127.83. It was closed March 29, 1956. Some $4,000 was checked out for property and income taxes of Mrs. Scott. Appellant used the remainder for his own purposes, including $1,141.29 paid for travel tickets, $503.75 for travelers checks, and $441.62 to the Jonathan Club.

Clark Sellers and Don E. Mire, examiners of questioned documents, testified that in their opinions the name of Mrs. Scott on the safety deposit box card and on the signature card of the Van Nuys Branch of Bank of America was written by appellant and that her name was forged upon the 23 travelers checks.

On August 1, 1955, appellant engaged a safety deposit box at the Beverly Hills Branch of the Security Bank under the name of Robert McDonald with an address of the Beverly Hills Hotel. He made seven entries into this box.

A few days after Mrs. Scott's disappearance, Mrs. Hanson who had been accustomed to doing housework once a week went to the Scotts' home; noticing that Mrs. Scott was not there she questioned appellant who told her that Mrs. Scott had become ill during the week and had gone away. Upon that occasion appellant gave Mrs. Hanson a bed-jacket which Mrs. Scott had always worn when applying her makeup in the morning. On the day she received the bed-jacket Mrs. Hanson cleaned Mrs. Scott's room; everything appeared to be the same; nothing appeared to be missing; some time later she discovered that some of Mrs. Scott's cosmetics were missing. During the summer she discovered a dress which was smaller than anything worn by Mrs. Scott and which had not

been there previous to May. Mrs. Hanson continued to clean the Scott residence and during the summer appellant gave her five handkerchiefs and a handbag of Mrs. Scott's. When Mrs. Hanson asked how his wife was doing, appellant stated: "No better," that she "had suddenly become ill and that such cases took time."

Frank Justice had worked for Mrs. Scott as a chauffeur and handy man since 1943. After Mrs. Scott moved to the Bentley address his work schedule was cut to 3 days a week and 4 hours a day. Mrs. Scott paid him $18 each Saturday. He was discharged by the appellant on May 30th and was given a check for $100. He was told by appellant that his further services would not be required, that appellant was going to move Mrs. Scott east for treatment and would follow her later and would close the home. Mr. Justice testified that appellant stated several times "he was discouraged with the way the doctors were making no headway with her diagnosis; and he told me that the only thing that they decided on was that she didn't have cancer." Appellant said "he was afraid that something was wrong with her mentally." Among Justice's duties was the emptying of the incinerator. He testified that appellant instructed him to empty the contents over the wall behind the incinerator but that he, Justice, had never thrown anything over the wall except ashes from the incinerator.

On June 14th, appellant discussed with W. Frank Hannifer, manager of Cunard Steamship office in Los Angeles, a proposed trip around the world for one person at a cost of $7,250. He discussed the same matter with Mr. Vodak, assistant manager. In September he discussed various steamship trips with Elizabeth Gebbie, travel clerk with Thomas Cook and Sons. None of these trips materialized but in January, 1956, appellant paid Thomas Cook and Sons $1,141.29, the price of a contemplated trip to the West Indies.

Appellant continued to live in the Bel Air home for the better part of a year after Mrs. Scott's disappearance. In July of 1955, he met Mrs. Harriet Livermore whom he entertained and by whom he was entertained in her home. When he first met her he told her that he evidently could remain married only five years, his first marriage had lasted only five years, and now after five years his wife had left him and he was a very lonely man. Later he told Mrs. Livermore that he was going to Reno or Tahoe because of a throat trouble he had contracted through his wife's constant smoking. He took a trip and while away he corresponded with

her. Mrs. Livermore did not learn until October that Mrs. Scott had disappeared. When she questioned him he told her that his wife had disappeared while he was on ·an errand for her, that she had done the same thing before, and when asked how she could have left unprepared he stated that she always had about $18,000 with her. He also said that his wife was an alcoholic, a chain smoker and a Lesbian but when asked why he did not get a divorce he· replied that instead of getting a divorce he was going to wait for seven years, when she would be declared legally dead. He said he owned an apartment house in Milwaukee, had sold all of his stocks and was in a liquid position. He asked Mrs. Livermore whether she would be interested in taking a round the world cruise with him and invited her to go to Guatamala, which invitations she declined.

In August appellant met Mrs. Marianne Beaman. Thereafter he divided his attention between Mrs. Beaman and Mrs. Livermore, being in the company of the former as often as three times a week. In each of the four months following his meeting Mrs. Beaman he had her as an overnight guest in Mrs. Scott's home. In October and December they went together to San Diego, stayed at the Kona Kai Club, where they were registered as husband and wife, and in November went to Las Vegas where Mrs. Beaman was introduced as Mrs. Scott. Appellant told Mrs. Beaman that his wife had left him; she had tried to poison him on several occasions; she drank a great deal and he believed that she was ill and needed psychiatric care. In the latter part of 1955 appellant commenced making presents to Mrs. Beaman of Mrs. Scott's possessions; he gave her three purses, a leather hatbox, a train case, a night lamp, a black wool coat, a fiberglass make-up case, some aquamarine earrings, a gold bar pin set with a diamond, a silver chain necklace with diamond, a wide bracelet with multicolored stones and small pearls, two pearl necklaces, one with large pearls and earrings to match. He gave her a bathroom scale and heater. He brought to her apartment a typewriter and a large carton of silverware. With respect to these gifts he told Mrs. Beaman that they belonged to Mrs. Scott but that she had no use for them. In the early part of 1956, appellant made Mrs. Beaman a somewhat tardy proposal of marriage, which he repeated after the disappearance of Mrs. Scott had been made public. Mrs. Beaman promised to marry him after his problems had been settled.

Commencing immediately after May 16th appellant entered

upon a course of concealment and deceit calculated to forestall an investigation of his wife's disappearance.

The first step in a calculated plan to account for Mrs. Scott's disappearance was the cancellation of her appointment at the beauty shop on May 17th and all future weekly appointments.

Mrs. Scott's friends soon became alarmed over their frequent unsuccessful attempts to communicate with her by telephone. Mrs. Baum had been calling early in the morning and late in the evening, but had received no answer. About the middle of June appellant telephoned her that he was returning a book that had been loaned to Mrs. Scott. He told Mrs. Baum that Mrs. Scott was ill and had been ill for two years, that he was closing the house and preparing to take her to Baltimore or New York for treatment. Mrs. Baum asked to speak to Evelyn and offered to help but was told that she was too ill to talk and there was nothing Mrs. Baum could do. Appellant promised to let Mrs. Baum know where Evelyn would be in the East but she heard nothing more from him. A letter she sent to Mrs. Scott expressing her distress over the latter's illness was not returned.

Soon after May 16th, Mr. Brawner attempted to reach Mrs. Scott by telephone. He made inquiries of everyone he thought might have information concerning her, including people in Milwaukee, New York, Los Angeles and Santa Barbara, as well as all the local friends. In June and July he went to the Bentley address but did not attempt to enter and in July he asked the district attorney to investigate Mrs. Scott's disappearance. He contacted Evelyn's brother, Mr. Throsby, through an advertisement placed in a daily paper and they discussed Mrs. Scott's disappearance. In February 1956, he placed an ad in a newspaper offering a reward of $50 for information leading to the whereabouts of Mrs. Scott. He had some responses to the ad but when these were checked out they were found to be of no help.

Mrs. Schuchardt returned from Europe June 14, 1955. Appellant called her on the following day and told her that Mrs. Scott had been very ill, mentally and physically, and that he was placing her in a sanitarium in the East, although he had not decided where he would take her. Mrs. Schuchardt asked to speak to Mrs. Scott and appellant replied that it would be impossible as she was then standing in the middle of the bathroom with a bottle of whiskey in her hand, using

obscene language; that he had been up all night with her and was tired out. He said that his wife had probably been married six or seven times before she married him and was extremely angry. He asked Mrs. Schuchardt to tell Mrs. Scott's friends that she was being taken East for treatment and Mrs. Schuchardt complied with his request. She asked to be advised where Mrs. Scott would be taken but she never heard from the appellant again. She discussed the matter with many mutual friends. A letter she wrote to Mrs. Scott was returned to her after it had been forwarded to the Lord Baltimore Hotel. No acknowledgment was received of a telegram which she addressed to appellant.

Mrs. Ora Jones, who had been Mrs. Schuchardt's nurse for a number of years, drove Mrs. Schuchardt to the Bentley address on six or seven occasions. On one occasion they rang the bell, to which there was no reply, although it was evident someone was in the house.

Mrs. Watson testified that after she received a stole from Mrs. Scott in May 1955, she wrote her a letter of thanks but received no reply. To a letter to appellant she did receive a reply in July informing her that "Evie had suffered a mental breakdown which had been coming on for over a period of time, that she was giving things away, her clothes, furs and jewelry, including some of his mother's jewelry." The letter stated: "The future appears to be a long, questionable road, paved with heavy expenses." Mrs. Watson sent a copy of this letter to the district attorney together with a copy of her reply to appellant in which she stated it was impossible for her to believe Evelyn had suffered a mental breakdown. Appellant did not reply to this letter. (The handwriting on the wrapping paper which enclosed the fur piece sent to Mrs. Watson proved to be that of appellant.) A letter which Mrs. Watson addressed to appellant in September 1955 was returned with a notation of forwarding addresses including Elms Hotel, Excelsior Springs, Maryland.

Mrs. Opal Mumper last saw Mrs. Scott between March 10th and 15th when they lunched at a café. In June she endeavored to telephone her and in the following month went with Mrs. Davis to the Scott residence; when the doorbell was not answered she and Mrs. Davis went to the rear of the house where they saw appellant seated in the den, twirling his eyeglasses. She pressed the front doorbell again and heard it ring but no one appeared. Mrs. Davis testified to the same incident.

Raymond Throsby was Mrs. Scott's brother. The two had long been upon the most friendly terms until they disagreed over a loan of $3,600 which Mrs. Scott made her brother in 1950. In 1951 Mr. Throsby went to the Marshall Islands where he received a letter from Mr. Boyle requesting payment of a note of $1,300. He wrote to his sister an extremely bitter letter containing statements concerning her drinking which, he testified, were entirely false. Evelyn replied, explaining that Mr. Boyle's letter was written to show some semblance of an effort made to collect the debt and that it was merely for tax purposes. Whatever breach there was at the time was healed and in the spring of 1953, shortly after Throsby's return from an extended stay in the Marshall Islands, the two had a friendly meeting and Mrs. Scott forgave the debt. They met again in the early part of 1954 in which year Throsby sent his sister a birthday gift. He knew nothing of her disappearance until October of 1955. He went to the Bentley residence; the lights were on; he knocked on the window but received no response. He visited the house on at least 10 other occasions but did not encounter appellant until some time in November. He blocked the driveway with his car and prevented appellant's exit. We shall have occasion to refer to this incident later and shall relate Mr. Throsby's account of the conversation. He testified that appellant turned white and said: "You're the last person in the world I expected to see here." He asked where his sister was and Scott replied: "She is out. She is on a drunk." Throsby called Scott a liar and said: "I want to know where my sister is and what you have done with her." Scott said: "I don't know where she is. She disappeared, but she has been back to this house." Throsby said: "I believe you are lying." Scott replied: "Well, she has been back to the house. I know because we had a common rendezvous where we would leave messages for one another as we returned to the house, to let each other know of our—of the whereabouts." Throsby asked "Did she leave a message?" and Scott said "No. But the vase has been moved. That is where we left the little notes." Throsby said "You are still lying. You told so many confusing and conflicting stories about my sister—I believe you did away with her." Appellant did not answer. Throsby asked him if he had reported Evelyn's disappearance to the police and appellant said "No. Why should I? The District Attorney interrogated me, that is all I have to say about it. If she

doesn't show up soon I am going to get a divorce." March 5, 1956, Throsby caused a petition to be filed to create a trusteeship for his sister's estate and he reported her disappearance to the police.

Mr. Boyle last saw Mrs. Scott in April 1955 when he prepared her income tax return. He first learned of her disappearance in July through various friends who called making inquiries. He tried to reach her by telephone. On two days and two nights during the month of July he went to the Scott house, heard the door bell ring but got no response, although he heard the sound of music. He wrote to appellant telling him of his efforts to reach Mrs. Scott and stating "I will appreciate it if you will call me on receipt of this letter as I would very much like to talk to you." Scott replied from the Drake Hotel in Chicago: "I am sure there is nothing at this time that requires your services but should the need arise either Evelyn will contact you direct or through me." Mr. Boyle addressed a letter to appellant at the Drake Hotel but it was returned to him. He sent another letter to the Bentley address which stated: "You have suggested that in my letter of September 2nd I was offering to perform services for Evelyn. This, of course, is not the case. Not having heard from her since April and having been contacted by several of her friends who say they have been unable to reach her or learn anything about her, I have been trying to reach you or Evelyn for the past six or seven weeks but without success. My interest in Evelyn, as you should know, is because of my long friendship for her and not because I want to render legal services. If she is ill or other misfortune has struck her I would like to know about it. I expressed this concern in my previous letter and I am somewhat surprised that you have not called to let me know the details. Always before either you or she has done so. I would, therefore, very much appreciate your calling me on receipt of this letter so that I can be brought up to date." The letter was not returned nor was a reply received. Other friends made many attempts to communicate with Mrs. Scott or appellant. Their calls were not answered and they received no word from appellant.

In October 1955 appellant ordered Christmas cards from Dorothy Fox, at first 50 cards with the names Evelyn and Ewing and later more without names. Mrs. Fox asked to see Mrs. Scott but appellant replied that she was too ill and could not look at the cards. In December, Christmas cards were received by a number of Mrs. Scott's friends. They

were mailed from St. Petersburg, Florida, and were inscribed "from Evelyn and Ewing Scott," in the handwriting of appellant, who was in California at the time.

Roy Whorton, a defense witness, testified that in June 1955 appellant told him that Mrs. Scott had left, might possibly have gone East and could possibly be in a sanitarium. He and his wife had met Mrs. Scott whom he described as a perfect lady, well poised and intelligent. Mr. and Mrs. Whorton met appellant and Mrs. Beaman in Las Vegas where the latter was introduced as appellant's wife. In June 1955, appellant told Mrs. Whorton that his wife was an alcoholic and that he thought she was in a sanitarium. He never discussed the possibility of his wife's returning.

On March 9, 1956, Lt. Zander, in a conference in the district attorney's office, learned that appellant claimed that his wife disappeared on May 16, 1955. Appellant was arrested April 25, 1956 and was questioned by Officers Zander and Brown. He was requested to give any reasons he might have for his wife's disappearance. He stated to the officers that he and his wife returned from an automobile demonstration on May 16th at about 4:30 p.m. and that Mrs. Scott sent him to the Village to buy a can of Eff-Reimin dentifrice; he was gone 35 to 45 minutes; when he returned Mrs. Scott and her car were missing but that he thought nothing of it since she had been away for two days at a time on several occasions. He stated that in the evening he found the car parked on a street where he had previously seen it parked and the next morning called a cab and returned the car to the garage. Appellant's replies to questioning indicated not only that his accusations derogatory of his wife were wholly unfounded but that he knew them to be false. When questioned as to why he called his wife a Lesbian he said that when he married her she had a secretary although she had no need for one; he had seen to it that she was discharged; Mrs. Scott frequently wrote to Mrs. Watson; once in Chicago she became friendly with a woman who answered a call for room service, gave her presents and went to her home once for dinner; once in a hotel, at dinner, his wife talked more to the headwaiter, a Greek, than she did to him. Zander informed appellant that he had been quoted as calling his wife a drunkard and a person mentally unbalanced and asked his reasons for such statements. With respect to Mrs. Scott's drinking, Zander told appellant that her friends denied that she overindulged to which appellant re-

plied "Well, naturally they would tell you that because they are a bunch of drunkards themselves." When questioned as to his reasons for stating that Mrs. Scott was deranged, appellant said that she had remarked that between 10 minutes and five minutes before the hour only four minutes were indicated on the dial, which he thought was very strange, but he still thought it was very strange when Zander remarked that she was probably referring to the four marks in that space. Appellant also said that Mrs. Scott had remarked that he should throw out some artificial flowers because they were starting to wilt. Appellant did not think she was joking but that the statement indicated she was in need of mental treatment. He told Lt. Zander that he was engaged in merging corporations and in connection with that work held a safety deposit box under a fictitious name (Robert McDonald). He said he had a steady income but declined to answer whether he filed income tax statements. He stated he had around $32,000 invested in Mrs. Scott's Milwaukee property; his wife was a constant drinker, keeping bottles all around the house and drinking all day long; she was "pretty well loaded" on May 16th which might not have been apparent to anyone but himself; he knew nothing of what was in Mrs. Scott's will but intimated that if the investigation went deeper it would be discovered that Throsby was behind the affair. He stated that 2 or 3 weeks after Mrs. Scott's disappearance he discovered that two pieces of luggage and a small train cosmetic case were missing; his wife had only costume jewelry which he had given her but that it was of small value and there was so much of it it would be difficult to tell whether anything was missing. He was asked by Zander if he had cancelled insurance on several pieces of rather expensive jewelry and denied that he had done so. When shown his letter cancelling the insurance and placing insurance on some men's jewelry, he admitted having written the letter. On a later occasion, after considerable urging and delay, appellant produced valuable pieces of Mrs. Scott's jewelry. In the course of the interview after his arrest appellant stated to Chief of Detectives Thad F. Brown that he found Mrs. Scott's car parked on the street on the 17th and *"He drove the car home, spent most of the day cleaning the car up. The car was dirty. . . . the birds had been on it."* He said it was possible that Mrs. Scott had gone to a sanitarium in the East, that she was an alcoholic and drank enormous quantities of whiskey and also that she was a Lesbian; she was slipping mentally, and had

tried to poison him. Appellant opened a secret door in the library to show Brown that the closet contained a case and a half of whiskey and a bottle of Vermouth.

On April 22, 1956, Tom Nobles sold appellant, under the name of Robert Scott, a 1953 Ford for which appellant paid $941.07 in $100 bills.

On April 26, 1956, appellant was indicted for 13 offenses of forgery and grand theft and was arrested. His bail was fixed at $25,000 and arraignment was set for May 15th. In his application for a bond, appellant stated he had no assets. He deposited with the bail agent $17,500 in $100 bills. The premium of $2,500 was paid by check of appellant's then attorney and the bond was issued. When appellant failed to appear on May 15th, his bail was forfeited. He had fled to Canada where he was apprehended the following year.

On the morning of May 1st appellant drove Mrs. Beaman home in Mrs. Scott's Dodge car. It was undamaged at the time. In the evening he met Mrs. Beaman for dinner. He did not have a car and walked her home. At 8 or 9 o'clock that evening the Dodge was seen parked on the street. It had not been there at 6 o'clock. On May 6th the police hauled it away. There was a bullet hole through the windshield and marks of another bullet but no evidence that anyone had been struck. If it was the purpose of appellant to claim that he had been fired upon he changed his mind. The incident was not explained.

On May 2, 1956, having been in an accident on his way out of the state, through Bishop, appellant had his car repaired in the Ford agency. He paid the charges of $273.18 in $100 bills. The car was registered in the name of Robert Scott and appellant used that name with the Ford agency and also with the Valley Motel in Bishop where he registered under a San Diego address.

After appellant's disappearance, bulletins and descriptive circulars were published. On April 9, 1957, appellant contacted Richard E. Leslie, an automobile salesman in Detroit. He gave the name of Lewis Stuart. He stated that he was hurrying East where he had bank accounts as his wife was divorcing him. On April 12th they drove to Toledo, since appellant feared he could not get an operator's license in Michigan. Thereafter they started for Chicago but at appellant's request returned to Detroit. Appellant paid Leslie with 25 $100 bills, receiving $25 in change. The buyer's order was signed "Lewis Stuart" and gave an address of an aunt of

Mr. Leslie's in Oak Park. Upon attempting to return to Canada through the Detroit-Windsor Tunnel, appellant signed the name "Lewis Stuart" to a visitor's permit, was recognized by Everett Archie Bale, a Canadian customs officer, was arrested and returned to California.

The evidence of the People as stated was documented with many writings and other exhibits.

Several witnesses were produced by the defense. Sheila Bergman, who lived next to 217 North Bentley, testified that some time prior to June 1955 she threw away old medicines she could not identify; also discarded were a cigarette holder and filters. They were placed in trash cans by her incinerator. One of appellant's former attorneys heard of a woman in Mexico who was reported to have said she had seen Mrs. Scott. He convinced himself that the woman was not Mrs. Scott. He also investigated a report that she had been seen in San Pedro and found it erroneous. Perry Pasmezoglu had met appellant in St. Louis in 1934, at which time appellant appeared to be prosperous. One Maxwell Rozan, an ex-convict, testified that in 1953, 1954 and 1955 he had observed Mrs. Scott at bars in Beverly Hills and Bel Air and that she appeared to be intoxicated. H. F. Eames, store manager at Santa Paula, testified that on the 19th, 20th and 21st of May, 1955, he saw a person in his store who, in his opinion, was the same as the person depicted in photographs of Mrs. Scott that were shown him while he was on the stand. He testified that the woman came to the store with two other women and that he also saw her during the 1955 holiday season. He could not describe the other two women. He testified further that he was interviewed by one of the attorneys for appellant who was accompanied by a large woman of middle age. This woman stated to him that she had been a nurse for Mrs. Scott. The witness seemed to have a vague impression that the woman said that she had been in the store with Mrs. Scott when some articles were purchased and also that she said something about having received a letter from Mrs. Scott, but he could not remember. Ladya Sanborn looked at photographs of Mrs. Scott and testified that she had seen the same woman in Mexico City about August 18, 1955. She could not identify other photographs of Mrs. Scott. Evelyn Routhier testified she met Mrs. Scott in a USO hospitality center in 1930 and saw her again in Beverly Hills May 19, 1955. She corrected her testimony to state that she first met Mrs. Scott in Patriotic Hall in 1940. Julian Warnack, a ticket seller for

the Santa Fe Railroad, testified that he sold Mrs. Scott a ticket to New York July 20, 1955. He first heard of her disappearance about 8 or 9 months later. The records of the railroad, produced in rebuttal, were in flat contradiction of the testimony of Warnack. He was also shown to have made statements in contradiction of his testimony.

The controlling questions were whether Mrs. Scott left her home voluntarily and alone and whether appellant knew after the 16th of May that his wife was dead. If it was found that Mrs. Scott left home alone it would follow that appellant was not guilty of her murder. If she did not leave home voluntarily, her body was removed by someone who had already caused her death or she was taken by someone who had planned it. This could have been no one other than appellant. The verdict implies that the jury concluded that Mrs. Scott did not leave home by herself and that appellant knew after May 16th that she was dead. These were inferences which it would have been necessary for the jury to draw in order to reach the conclusion of appellant's guilt.

It is not enough that the jury should have believed that the proved circumstances tended strongly to establish the guilt of appellant. The final test to be applied was whether the facts found and the reasonable inferences from them proved the nonexistence of any reasonable hypothesis of innocence.

Appellant contends that since no body was produced, no direct evidence of death was introduced and there was no confession, the People's case was based upon mere suspicion and conjecture.

If this contention is valid it would mean that a man could commit a secret murder and escape punishment if he was able to completely destroy the body of his victim, however complete and convincing the circumstantial evidence of guilt. No one would say that the law should be powerless to uncover such a crime and inflict punishment unless the accused had made a confession. The question, however, is whether it is so inadequate. We hold that it is not.

The corpus delicti can be proved by circumstantial evidence. (*People* v. *Alviso*, 55 Cal. 230; *People* v. *Wilkins*, 158 Cal. 530 [111 P. 612]; *People* v. *Watters*, 202 Cal. 154 [259 P. 442]; *People* v. *Hales*, 23 Cal.App. 731 [139 P. 667]; *People* v. *Hamilton*, 49 Cal.App. 30 [192 P. 467]; *People* v. *Spencer*, 58 Cal.App. 197 [208 P. 380]; *People* v. *Clark*,

70 Cal.App. 531 [233 P. 980].) ▮ Can circumstantial evidence be sufficient to supply proof of guilt so convincing as to preclude every reasonable hypothesis of innocence? We hold that it can be sufficient.

▮ All that is required to prove death is circumstantial evidence sufficient to convince the minds of reasonable men of the existence of the fact. ▮ The law employs the judgment of reasonable minds as the only means of arriving at the truth by inference from the circumstances in evidence. If this were not true, an infinite number of crimes involving the element of a specific intent would go unpunished.

In speaking of the value of circumstantial evidence the Supreme Court in *People* v. *Cronin,* 34 Cal. 191, and *People* v. *Morrow,* 60 Cal. 142, quoted from *The King* v. *John Thurtell,* 2 Wheel. Crim. Cas. 461, as follows: "The eye of Omniscience can alone see the truth in all cases: circumstantial evidence is there out of the question: but clothed as we are with the infirmities of human nature, how are we to get at the truth without a concatenation of circumstances? Though in human judicature, imperfect as it must necessarily be, it sometimes happens, perhaps in the course of one hundred years, that in a few solitary instances, owing to the minute and curious circumstances which sometimes envelop human transactions, error has been committed from a reliance on circumstantial evidence; yet this species of evidence, in the opinion of all those who are most conversant with the administration of justice and most skilled in judicial proceedings, is much more satisfactory than the testimony of a single individual who swears he has seen a fact committed."

In the reported cases of murder there was almost invariably proof of death consisting of (1) direct evidence of the use of the means of death upon the body of the missing person, as in some cases of death at sea, (2) production of a body or part of a body identified as that of the missing person, or (3) incriminating circumstances sufficient to prove the corpus delicti and an admission or confession of the fact of death. There may be added a few cases of the disappearance of infants under suspicious circumstances in which the fact of death was satisfactorily proved. These are of no assistance.

There are a great many cases of the third class which without exception hold that proof of the corpus delicti plus a confession is legally sufficient. The facts of the present case, in our opinion, bring it clearly within the principle of the confession cases.

In the cases of *Alviso, Wilkins, Watters, Hales, Hamilton* and *Spencer, supra,* there was either direct evidence of the use of the means of death or production of human remains; the cases furnish no precedent for our holding in the present case.

In *People* v. *Clark* (1925), 70 Cal.App. 531 [233 P. 980], the court affirmed a judgment convicting Clark of the murder of one Schick. No remains were discovered. The evidence of the corpus delicti was purely circumstantial. Schick left home one morning in his car. In the evening the defendant and his wife appeared at the Schick home in Schick's car. Defendant also had a watch, a Masonic emblem and ring which belonged to Schick. He fabricated an account of Schick's having left the country. He gave Mrs. Schick the keys to the automobile and a safety deposit box which they entered by means of a forged letter. By various devices defendant obtained considerable sums of money from Mrs. Schick with whom he had been intimate for some time before the disappearance of Mr. Schick. After the date of his disappearance no trace of Schick was discovered. There was testimony of a witness that Clark had confessed the murder. After a review of the authorities it was held that the circumstantial evidence, independent of an admission or confession, was sufficient in quantity and quality to prove the corpus delicti. Apparently it was not contended that the independent evidence, considered with the evidence of the confession, was insufficient to support the verdict of guilt.

In *People* v. *McMonigle,* 29 Cal.2d 730 [177 P.2d 745], and *People* v. *Cullen,* 37 Cal.2d 614 [234 P.2d 1] convictions of murder were affirmed although in neither case was any trace found of the missing persons. In addition to proof of incriminating circumstances there was evidence in each case of the admissions of the accused which, if given full effect, would have proved the death of the victims by criminal means. The extrajudicial statements, although convincing of the fact that the accused had knowledge that the victims were dead, were nevertheless circumstantial and not direct evidence of the fact of death. Code of Civil Procedure section 1832 reads: "Indirect evidence is that which tends to establish the fact in dispute by proving another, and which, though true, does not of itself conclusively establish that fact, but which affords an inference or presumption of its existence. For example: a witness proves an admission of the party to the fact in

dispute. This proves a fact, from which the fact in dispute is inferred." (*Cf. People* v. *Koenig,* 229 Cal.2d 87 [173 P.2d 1]; *People* v. *Gould,* 170 Cal.App.2d 489 [338 P.2d 938].)

The result in the McMonigle, the Cullen and the Clark cases was that without the production of a body the convictions were affirmed upon circumstantial evidence which established the corpus delicti and additional evidence furnished by the confessions. The courts were not considering whether the confessions amounted to direct or indirect evidence of death. We think it was of no consequence how they would have been classified. Except in a few states with statutes requiring direct evidence (Colorado, Montana, New York, North Dakota, Texas), prima facie proof of the corpus delicti together with satisfactory proof of a confession has, we believe, invariably been held legally sufficient to support a conviction of murder.

The People have cited two comparatively recent cases of murder proved by circumstantial evidence in which convictions were upheld under the laws of England. They are *The King* v. *Horry* [1952] N.Z.L.R. 111 and *Regina* v. *Onufrejczyk* [1955] 1 Q.B. 388. Although in neither case was there evidence of the use of means of death upon the missing person, or a body produced, or a confession proved, the circumstantial evidence was held sufficient to prove death by criminal agency. They are landmark cases. The opinions do not declare any new principle in the laws respecting murder; they merely apply settled principles of circumstantial evidence to unprecedented facts. We consider them authoritative and shall review them at some length.

In *The King* v. *Horry,* the charge was the murder of Horry's wife, Eileen. The marriage took place July 11, 1942, in Auckland, New Zealand. Horry used the name George Turner and told Eileen and her family that he was doing important war work in the Secret Service, which was the first of his many falsehoods. Prior to the marriage Eileen purchased an expensive trousseau, sold her house, and withdrew all her money from the bank; the proceeds were given to her in the form of a check for 687 pounds. Horry told her relatives that he and Eileen would be going first to Australia and then to England. He also told Eileen's mother that she could not be informed of their arrival in Australia and that she would receive no word from them for three and one-half months. The Horrys spent their wedding night in a hotel. They left the hotel the following morning and drove off

toward Auckland. They stopped to visit a Miss Shepherd on the way. Miss Shepherd was the last person, other than Horry, to see Eileen alive.

On July 14th defendant opened a bank account under an assumed name and succeeded in depositing a small sum in notes and the check for 687 pounds. The account was closed and some of the money was deposited in an account Horry had previously maintained; he told the bank officials that deposits would be made by his future wife and himself.

In August 1942, Eileen's father received a letter signed ''George and Eileen'' stating that the Horrys were leaving for England almost immediately. Horry had caused it to be mailed from Australia. In December, Horry went to see Eileen's mother. He told her that he and Eileen had been traveling from America to England on a ship called The Empress of India; the ship was sunk by a German submarine; the women were put in lifeboats but were not seen thereafter; he had been picked up by a British warship. It was established that there was no such ship as The Empress of India. Two months later Horry sent a letter to Eileen's mother ostensibly from Brisbane stating that he had received information from England to the effect that Eileen had lost her life. Meanwhile, he had remarried.

In June 1943, Horry was interviewed by two detectives at his home. He told the officers that Eileen left him the day after they were married and that he married her to facilitate her running off with another man; for his services he received from Eileen 650 pounds from the check for 687 pounds. When informed that there was no evidence of Eileen's having left the country and that there was no registration of her death Horry said: ''I can see now it is getting complicated.'' He admitted telling Eileen's mother about the torpedoing of the ship, explaining that Eileen had instructed him to do so in a letter he had torn up. He denied having any of Eileen's property on the premises but the officers found her hat box and a suitcase containing part of her trousseau. Horry was arrested in June 1951. When his present wife asked what was the matter he said: ''It's that Turner business.'' Mrs. Horry asked: ''Why, has she turned up?'' Defendant replied: ''That's impossible; she couldn't have.''

It was said in the opinion of the court: ''There does not appear to be any case in which, without any evidence of a body, or traces of a body, or violence used to a body, or of anything approximating to a confession, the factum of the murder

has been held to have been sufficiently proved by circumstantial evidence. In the absence of any authority exactly in point, the approach must be to determine the governing principle and to apply it to the somewhat unusual facts of this case. . . . In this case, there is neither the body nor traces of the body, nor anything in the form of a confession, but, in our opinion, that does not exhaust the possibilities. There may be other facts so incriminating and so incapable of any reasonable explanation as to be incompatible with any hypothesis other than murder. It is in accord both with principle and with authority that the fact of death should be provable by such circumstances as render it morally certain and leave no ground for reasonable doubt—that the circumstantial evidence should be so cogent and compelling as to convince a jury that upon no rational hypothesis other than murder can the facts be accounted for. . . . In our opinion, it was competent for the jury to infer the fact of death from the whole of the evidence as a matter of moral certainty leaving no ground for reasonable doubt. . . . A jury viewing the evidence as a whole was, in our opinion, entitled to regard the concurrence of so many separate facts and circumstances—themselves established beyond all doubt, and all pointing to the fact of death at or about July 13, 1942—as excluding any reasonable hypothesis other than her death, and having, therefore, sufficient probative force to establish her death. No alternative reasonable explanation has been put forward.'' The letter written by Horry to Eileen's parents stating his wife was dead was regarded by the court as only a circumstance tending to prove the defendant's knowledge that she was dead. The court approved of the charge which stated in part: ''According to that letter—I am not quoting its words—but according to that letter Eileen was dead; and it was Turner—that is, the accused—who wrote that letter to her parents to convince them that Eileen was dead. The Crown relies on that also as being to some extent a confession, indicating knowledge on his part that the woman was in fact dead, and that her parents, who might still be hoping to hear from her, would never hear from her again.''

In *Regina* v. *Onufrejczyk*, the defendant, a farmer of Polish extraction, was accused of murdering his partner, Sykut. The farm was a failure and Sykut was willing to sell his share to his partner for 700 pounds; if the latter could not buy him out, the farm was to be put up for sale. Onufrejczyk had no money and was trying desperately to negotiate a loan to buy

out Sykut's interest. The two men had quarreled. Sykut disappeared December 14, 1953, and no trace of his body was ever found, though, on subsequent investigation, minute quantities of blood were discovered on the wall of the kitchen and the defendant did not deny the blood was Sykut's. The defendant was the last person known to have seen Sykut alive. On December 18th, he sent a letter to a Polish woman indicating that Sykut had received most of the 700 pounds and was going away for two weeks. But there was also evidence that he went to London, tried to borrow money and asked a friend to help him forge some agreements purporting to bear the signature of Sykut. He told a sheriff's officer who went to the farm at 7 p.m. on December 18th to levy an execution that Sykut had gone to see a doctor; the statement was shown to be a fabrication. In his statement to the police he said that Sykut was kidnapped from the farm at gun point by three men in a large dark car around 7:30 p.m. on the 18th. He wrote letters stating that Sykut had gone to Poland and would not return, but it was established by letters from Sykut's wife in Poland that Sykut had not arrived there. He testified, on the other hand, that he expected Sykut to return to the farm. It also appeared that he asked the husband of a woman friend to go with him to a solicitor's office and impersonate Sykut and that he asked his friend to send him registered letters purporting to contain large sums of money but actually containing blank sheets of paper. A local blacksmith testified that on December 14th, the day of Sykut's disappearance, the defendant brought him a horse for shoeing; Sykut came by later in the day to pick up the horse; toward the end of December, when the police were making inquiries, the defendant paid him the bill for his services and tried to persuade him to say that Sykut had picked up the horse on the 17th. Here there was no confession or statement that Sykut was dead. The proof of death by criminal means was purely circumstantial but the court, approving what was said in Horry, had no hesitation in holding it sufficient. The court stated: "Now it is perfectly clear that there is apparently no reported case in English law where a man has been convicted of murder and there has been no trace of the body at all. . . . But it is, we think, equally clear that the fact of death can be proved, as any other fact can be proved, by circumstantial evidence, that is to say, evidence of facts which lead to one conclusion, provided the jury are satisfied and are warned that it must lead to one conclusion only." There was evidence

that when questioned about certain minute blood spots which were found in the kitchen, Onufrejcyzk said that his partner had cut his hand in the field and in coming in must have shaken his hand and shaken off the blood. This was regarded as but a minor circumstance indicating that Sykut might possibly have been disposed of in the kitchen. Upon a review of the circumstances in evidence the court said: "But this court is of opinion that there was evidence upon which the jury could infer that he was dead, and, if he was dead, the circumstances of the case point to the fact that his death was not a natural death. Then, if that establishes, as it does, the corpus delicti, the evidence was such that the jury were entitled to find that appellant murdered his partner." Thus, it is seen that there was no admission by the accused that his partner was dead and that the proof of death by criminal agency was purely circumstantial, but of sufficient strength to warrant the conviction of murder. We believe the evidence of the guilt of Scott was even stronger than the evidence in the Clark, Horry or Onufrejczyk cases.

It cannot be doubted that in the present case there was prima facie proof of death by criminal means. There remained the question of the quantum of the proof, which consisted entirely of circumstantial evidence. But it will be presently shown that the circumstantial evidence of the fact of death by criminal means was as strong and convincing as a confession would have been and much stronger than a confession of questionable validity.

Testimony that appellant had made statements that his wife was dead, if credited, would have constituted sufficient proof that he knew she was dead. The value of the testimony, however, would depend upon the credibility of the witnesses and the accuracy of their testimony as to what appellant had been overheard to say. But there could be no mistake as to the circumstances which pointed to the fact that after the 16th day of May, appellant knew his wife to be dead. The circumstances indicating the motives and state of mind of appellant prior to his wife's disappearance were created by him and no one else. He alone created the circumstances after the disappearance of his wife which indicated the state of his mind and his knowledge that she would not return.

Whether appellant knew that his wife was dead was a question of fact susceptible of proof by circumstantial evidence. (*The King* v. *Horry* [1952], *supra*, N.Z.L.R. 111;

*Regina* v. *Onufrejczyk* [1955], *supra,* 1 Q.B. 388; *People* v. *Turner,* 86 Cal.App.2d 791, 801 [195 P.2d 809].)

Later we shall summarize the evidence from which the jury determined that Mrs. Scott did not leave home voluntarily, and evidence which tended to prove that appellant knew that she was dead.

Our consideration of the contention that the evidence was insufficient to justify the verdict is governed by familiar rules. The decision of the jury as to material facts, and the inferences drawn therefrom, are to be accepted as conclusive on appeal if in our judgment they are such as could have been reached by impartial and reasonable minds. If there is room for difference of opinion among reasonable minds whether the facts impliedly found were justified by the evidence or whether the inferences drawn by the triers of fact were reasonable, we must accept their conclusions even though as triers of fact we might have reached opposite ones. (*People* v. *Cullen, supra,* 37 Cal.2d 614; *People* v. *Dragoo,* 121 Cal. App.2d 322 [263 P.2d 90].)

In our analysis of the evidence we have endeavored to find a reasonable theory of appellant's innocence. If we had reached the conclusion that such a theory does exist it would only have been incidental to the further question whether it was the only reasonable theory. The jury has determined that the evidence admits of no tenable theory of innocence. That determination is based upon the evidentiary findings of fact which the verdict implies. If those findings have support in facts established, and in reasonable inferences, they are conclusive on appeal. "After conviction all intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that upon no hypothesis whatsoever is there sufficient substantial evidence to support it." (*People* v. *Lindley,* 26 Cal.2d 780 [161 P.2d 227] ; *People* v. *Kerr,* 37 Cal.2d 11 [229 P.2d 777].) If we conclude that the implied factual decisions reached have substantial support in the evidence and that the inferences which led to the verdict were reasonably drawn, it is not our function to determine whether the ultimate findings were established beyond a reasonable doubt. That lies within the exclusive jurisdiction of trial judges and juries. (*People* v. *Smith,* 35 Cal.App.2d 73 [94 P.2d 633].) We could not declare the evidence legally insufficient except by holding that it furnished no good reason for believing that Mrs. Scott was murdered by appellant and

that it was consistent only with his innocence. We entertain no such notion. We have searched the record in vain for a reason that could have caused the jury to doubt that Mrs. Scott was murdered on the 16th of May. In our opinion, the only reasonable material factual conclusions are those which the jury presumably reached.

The circumstances that were established without dispute furnished strong evidence that Mrs. Scott met her death on or about the 16th day of May, 1955. But, as we have said, the test was whether the evidence of death was so overpowering as to preclude every reasonable hypothesis that she did not die at that time. The task of the jury could not have been completed without an exhaustive search for a reasonable ground for believing that she was alive when she left her home.

Our review of the evidence takes into consideration certain implied factual findings of the jury based upon the circumstances in evidence and those inferences which were necessarily drawn in order to furnish support for the verdict.

There was evidence from which the jury could, and presumably did reach many factual conclusions consistent only with appellant's guilt, among them the following:

1. Mrs. Scott was in sound physical and mental health; she was intelligent, competent, poised and self-controlled; her domestic life was tranquil and her social life satisfying to an unusual extent; she had a large number of devoted friends for whom she had great affection and whose society she enjoyed almost daily; her friendships were intimate, constant and they continued to the date of her disappearance; they were her principal interest in life. She took pleasure in small benefactions for a few old friends, which were greatly appreciated. She was well to do and had an ample income; she had suffered no misfortune or upsetting experience; she had expressed no intention or desire to go away but had said she would not be happy away from her friends. The jury inferred that it would be unreasonable to believe that Mrs. Scott had any motive for running away or that she would have left home voluntarily. This was a reasonable inference. It would have been an irrational thing to do and Mrs. Scott was not irrational.

2. She would not have left home without her eyeglasses and her denture. She would not have thrown them away. Someone found them after her departure and threw them away. When she removed the denture at night she always replaced it with the retaining device, which has not been found. These circumstances indicated that she retired the

night of May 16th after removing the denture and installing the retaining device.

3. If Mrs. Scott had intended to leave home she would have taken money, baggage and a wardrobe.

4. It would have been impossible for her to conceal herself for several years and find a way to live without drawing upon her bank accounts. It was incredible that if alive she would not have communicated with friends.

5. Appellant had a motive for doing away with his wife. It would give him a chance to steal her money through forgery of her name upon many documents. After her disappearance he displayed no sorrow, no regret or other human emotion. He spoke no kind word of her, only vilification and abuse. He appeared to be well satisfied to have her out of the way.

6. Appellant's purpose in persuading his wife to convert her securities into cash was to make it easier for him to obtain her property through forgeries.

7. Every act, every statement of appellant after the disappearance of his wife was consistent only with knowledge that Mrs. Scott was dead. His bold forgeries and thefts indicated that he knew she could not return to accuse him. On the morning of May 17th he cancelled all her future appointments at the beauty shop; he gave to Mrs. Hanson his wife's belongings, including her favorite jacket; he showered gifts of his wife's jewelry and personal belongings upon a female bedroom guest in his wife's home; he told Mrs. Livermore he planned to wait seven years until his wife could be declared legally dead; only he could have thrown away the eyeglasses and denture; he was the one who had ashes from the incinerator thrown onto the neighbor's property; he would not have cancelled insurance of $6,500 upon his wife's jewelry, to be effective May 17th, unless he knew his wife was dead; his constant lies that his wife had been or was to be sent East for treatment proved that he feared an investigation of her disappearance. Why was it necessary "to spend most of the day" on May 17th cleaning up Mrs. Scott's car and why did he not notify the police of her disappearance at that time or at any time thereafter? The jury no doubt inferred that the car was in a condition that required the removal of something more than a few spots of dirt and that appellant did not want it to be seen until it had been thoroughly cleaned.

We must presume that all the material questions suggested

by the evidence were answered by the jury in a manner which pointed toward appellant's guilt. The jury could reasonably have found, and no doubt did find, that every statement of appellant, every act and failure to act tended to prove that he was pleased to be rid of his wife.

Appellant has not mentioned and we have not found a single circumstance indicative of a belief on his part that Mrs. Scott was alive after her disappearance. Upon the contrary, every statement, every activity of his, was consistent with knowledge that she was dead.

Appellant has been content with the statement that his wife drove away in her car and did not return. He has made no attempt to give a reason for her disappearance. He has offered no explanation of his own conduct. It has been left to the jurors to determine what implications it carried. We can only conclude that appellant has felt immune from a conviction of murder in the belief that his wife's body lies where it cannot be found. This has been his attitude from the beginning. (See *People* v. *Watts,* 198 Cal. 776 [247 P. 884].)

It is our opinion that the circumstantial evidence forms a complete pattern of murder, from the first circumstance tending to prove appellant's motive, through his flight into Canada and his unwillingness to take the stand to deny, excuse or explain the conduct of which he stood accused. We have found in the evidence no rational explanation of the disappearance of Mrs. Scott other than her murder by appellant. We have been unable to reconcile the evidence with a theory that she was alive after May 16th.

It is contended further in attacking the sufficiency of the evidence of death that since one who has been absent and not heard from for seven years is presumed to be dead (Code Civ. Proc., § 1963, subd. 26), it was also to be presumed that Mrs. Scott is alive and will continue to be alive for seven years after the date of her disappearance. We shall have occasion to develop later in the opinion that this statutory presumption is not one to be brought into a homicide case. For the present we shall consider only the argument that there was a presumption of continued life which was not overcome by the evidence. The point has no merit. There is, of course, a general presumption that a person remains alive unless and until he is proved to be dead. The presumption of death in certain circumstances is provided by the code as sufficient proof if it is not overcome by other evidence. But death, of

course, can be proved within the seven year period or any other period. The general presumption of the continuance of life is no stronger than the presumption of innocence. We have seen that the latter presumption was overcome by evidence which was legally sufficient to prove Mrs. Scott's death.

The next contention to be considered is that even if there was sufficient evidence of Mrs. Scott's death, there was no proof that it occurred in the County of Los Angeles. ▮▮▮ Circumstantial evidence, however, may be sufficient to establish venue. (*People* v. *Montgomery*, 32 Cal.App.2d 43 [89 P.2d 184] ; *People* v. *Harkness*, 51 Cal.App.2d 133 [124 P.2d 85].) ▮▮▮ There was sufficient evidence to prove that Mrs. Scott died at the time she disappeared from her home on the 16th of May. If she was murdered on that night, it was either in her home or by someone who spirited her away with the intention of taking her life and disposing of her body so it could not be found. If the latter, and if she met her death outside the county of Los Angeles, jurisdiction would be in Los Angeles County as in any other county in which she might have met her death. (Pen. Code, § 781.)

The further contention that there was no proof that Mrs. Scott's death occurred within a year and a day is answered by our disposition of the last contention. There was no occasion for an instruction on the subject.

▮▮▮ The will of Mrs. Scott was introduced in evidence by the stipulation of the People and appellant. Nevertheless its admission is urged as error. The principal beneficiaries were appellant and Raymond Throsby. It is argued that since there was no evidence that appellant knew the contents of the will he could have had no motive for taking the life of his wife. But the fact that it was received in evidence under stipulation of counsel precludes appellant from contending that its admission was error.

▮▮▮ Error is assigned in the admission of evidence of appellant's forgeries and thefts. As we have previously stated, the indictment for murder also accused appellant in separate counts of nine offenses of forgery and four offenses of grand theft. However, the trial was limited to the accusation of murder and was concluded without disposition of the other counts of the indictment. There was no error in receiving evidence in proof of the accusations of forgery and grand theft over the objection of appellant. The proof was relevant and material not only because it tended to prove a motive of appellant for doing away with his wife but also to prove

502

knowledge on his part that she was dead. For these reasons the evidence was admissible. (*People* v. *Clark, supra,* 70 Cal. App. 531; *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924]; *People* v. *Weatherford,* 78 Cal.App.2d 669 [178 P.2d 816].)

It is contended that the court erred in the matter of the order in which the proof was received. Evidence of the declarations and actions of appellant both before and after the disappearance of his wife tended to establish the corpus delicti. It is argued that this evidence should not have been received until after the corpus delicti had been established and that the court committed error in the order in which the proof was received. There was, of course, no evidence of an admission of guilt. The order in which the proof is received is discretionary with the trial court. Appellant's contention is answered by the decision in *People* v. *Cullen, supra,* 37 Cal.2d 614. Moreover, the jury was instructed that any statements of a defendant indicating guilt could not be considered prior to the jury's having determined that the essential elements of murder had been established. There was no error in the order in which evidence was received of appellant's statements and activities.

A further contention is that appellant was required to divulge information of a confidential nature in violation of his right against self-incrimination and in breach of the confidence of his attorney. The point, in our opinion, is not meritorious. It was developed in the testimony of Eames, the store manager at Santa Paula, that he had been interviewed by one of appellant's attorneys who was accompanied by a woman. After the defense had rested and outside the presence of the jury, the prosecutor requested that the court order the name of this woman to be revealed. Defense counsel objected. After extended argument the court ruled that the name should be stated and counsel stated that her name was Mary Lewis. Later Eames identified Mary Lewis, who was seated in the courtroom. We are at a loss for a good reason for requiring counsel to disclose the name of Mary Lewis. She had not testified for the defense and it was obvious that she would not have repeated under oath the statements attributed to her by Eames. That was enough to prove that those statements, if made, were false, and that the lady knew nothing about the disappearance of Mrs. Scott. As far as we can see, no purpose was accomplished by the court's order except to satisfy the curiosity of the prosecutor. The incident was related to the flimsy testimony of Eames. His testimony,

together with that of appellant's other volunteer witnesses, was evidently rejected by the jury as preposterous. Identifying Mary Lewis as the woman who talked to Eames resulted in no prejudice to appellant.

The court gave the following instruction: "An inference may be based on an inference. That is to say, an inference may be based upon a fact which is itself based upon circumstantial evidence. However, an inference may not be based upon an inference that is too remote or conjectural." The court also instructed that: "An inference is a deduction which the reason of the jury draws from the facts proved. It must be founded on a fact or facts proved and must be such a deduction from those facts 'as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passion of the person whose act in question, the course of business, or the course of nature.'"

Appellant criticizes the first instruction as contradictory of the principle stated in the second one. He does not point out wherein they were contradictory or how the instruction, if erroneous, could have resulted in any unfair disadvantage to him. The ultimate inference of appellant's guilt was based upon facts found by the jury as deductions from the circumstances in evidence. The instruction was not erroneous. (*Vaccarezza* v. *Sanguinetti,* 71 Cal.App.2d 687 [163 P.2d 470]; *People* v. *Chessman,* 38 Cal.2d 166 [238 P.2d 1001]; *Ybarra* v. *Spangard,* 93 Cal.App.2d 43 [208 P.2d 445].)

Appellant also criticizes the instruction which defined the corpus delicti. He says it was confusing but does not point out wherein it was confusing. His argument that the court should have defined the term "criminal agency" is not persuasive. The jury would have understood the term as relating to acts in violation of law.

It is contended that the court should have instructed that the venue was to be proved by a preponderance of the evidence. The court gave two instructions on the subject of venue. The first, which was given at the People's request, correctly stated that the venue need not be shown beyond a reasonable doubt, but that "proof of venue is sufficient if the circumstances shown in evidence lead to a conclusion that the crime was committed, or that preliminary arrangements for the commission of the crime or any part thereof were made, in the county as charged." The second,

which was proposed by appellant, would have told the jury that venue had to be shown beyond a reasonable doubt. The court modified appellant's instruction by deleting the reference to proof beyond a reasonable doubt and gave it as modified. It read in part "Venue may also be established by circumstantial evidence; however, the degree of proof required concerning venue is the same as that required of all other evidence in criminal prosecution." If appellant had wished the court to give a better instruction than those that were given on the quantum of proof respecting venue, he should have submitted a proper instruction on the subject. Moreover, if Mrs. Scott was murdered on May 16th the jury could not reasonably have found that the murder was committed entirely in a county other than Los Angeles.

The court instructed that declarations of an accused may be considered with other evidence in determining whether the essential elements of the crime have been established provided they do not constitute an admission of guilt, but that statements which the jury might determine constituted an admission of guilt were not to be given consideration in support of proof of the elements of the offense. The criticism seems to be that the instruction made it possible for the jury to consider some statement of appellant in the nature of an admission of guilt or a confession as evidence tending to prove the corpus delicti. The instruction was a correct statement of the law. (*People* v. *Fratianno,* 132 Cal.App.2d 610 [282 P.2d 1002].) There was no evidence of any statement made by appellant in the nature of an admission of guilt or a confession.

We find no error in the instruction on the failure of appellant to testify. Appellant has pointed out none. The instruction correctly stated the law as declared in *People* v. *Adamson,* 27 Cal.2d 478 [165 P.2d 3], and other cases.

And it was proper for the district attorney, in his argument to the jury, to comment upon Scott's failure to take the stand. (Cal. Const. art. I, § 13; *Adamson* v. *California,* 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223].)

In several instructions, the court defined forgery and grand theft This is assigned as error. One of the instructions stated that the acts of appellant which would fall within the definitions were not to be considered as evidence of criminality or to be considered at all unless they tended to prove that appellant had a motive for commission of the murder

charged in the indictment. Since, as we have already held, evidence of the forgeries and thefts was properly admitted, the instruction was not erroneous or improperly given. The instructions given fully covered the subject of an instruction proposed by appellant, which was refused.

A further contention is that the court committed error in giving an instruction to the effect that death of a person may be proved by circumstantial evidence at any time within seven years after the person's disappearance.

 At the request of appellant the court instructed as follows: ''That a person not heard from in seven years is dead, and during said seven year period, unless death is shown beyond a reasonable doubt, said person is presumed to be living.'' At the request of the People, the court gave another instruction reading: ''The presumption of continuation of life for seven years is a rebuttable presumption which can be overcome by evidence which quickens or shortens the time by showing that the death of the alleged deceased occurred prior to the passage of seven years. Any evidence, facts or circumstances concerning the alleged deceased, relating to the character, long absence without communicating with friends or relatives, habits, condition, affections, attachments, prosperity and objects in life which usually control the conduct of a person, and are the motive of such person's actions, and the absence of any evidence to show the motive or cause for the abandonment of home, family or friends or wealth by the alleged deceased, are competent evidence from which may be inferred the death of one absent and unheard from, whatever has been the duration or shortness of such absence.'' The criticism of the latter instruction is that it is argumentative and that it placed undue emphasis upon the evidence which the People relied upon to establish death. It is not contended that the instruction misstated the law. We have concluded that appellant suffered no prejudice from the giving of the People's instruction.

Neither instruction should have been given. The presumption of death after a person has been absent and unheard from for seven years, introduced by appellant's instruction, has no place in the law of homicide. It is not a presumption of life. There is a general presumption of the continuation of life. The statutory rule merely replaces that presumption with a presumption of death in certain circumstances. The presumption should not have been mentioned. The jurors knew, as anyone would know, that when murder is charged the evidence

must show that some one was killed. They were instructed and they knew that the fact of death had to be proved beyond a reasonable doubt. They knew they would have to decide that question from a consideration of all the evidence. The People's instruction did not state a different rule. It did not purport to state what evidence might be sufficient to prove death beyond a reasonable doubt. If it did not suggest that the fact of death could be proved by a lesser degree of evidence it was not misleading or erroneous. If it did not tend to over-emphasize evidence upon which the People were relying, it was not harmful to appellant. In our opinion it was not subject to either criticism. Although the instruction should not have been given it is not reasonable to believe that it was prejudicial. In spite of the references to a rebuttable presumption of death after seven years and how the presumption of life could be overcome by inference, the instruction said only that it would be reasonable to believe from certain facts established by the evidence that Mrs. Scott would not have run away from home and gone into hiding. That is the meaning of the instruction and the interpretation the jury would have given it. The facts stated were only those that had been drilled into the minds of the jurors from day to day by the testimony of many witnesses. We do not doubt that if neither instruction had been given the jury would have concluded that Mrs. Scott did not run away from home. The evidence all pointed to that conclusion. We have previously made a statement of the evidence which made out a convincing case of appellant's guilt. Any error in injecting into the case the irrelevant rule of presumed death after seven years could not possibly have deprived appellant of a fair trial. ▮ Unless we were convinced that he was deprived of a fair trial we could not disturb the judgment. (*People* v. *Watson,* 46 Cal.2d 818 [299 P.2d 243].)

▮ Error is assigned in the introduction of evidence with respect to the flight of appellant and in the giving of an instruction on the subject of flight. It is contended that since Scott did not flee the jurisdiction until nearly a year after the disappearance of his wife, but soon after his indictment for forgery and grand theft, he could not have fled from prosecution for a murder of which he had not been accused. There was no error. Appellant's flight to Canada and hiding out under an assumed name was a circumstance which was properly proved and entitled to be considered by the jury. Appellant knew he was under investigation for the murder of his wife and that if he should be indicted for murder he would

have no chance to escape. Throsby's statement "I believe you did away with her" was an accusation which, with the investigation by the police that was under way, could not have failed to cause appellant to anticipate a charge of murder.

 Appellant makes the further point that the court improperly gave an instruction on accusatory statements. He contends that there was no basis in the evidence for the instruction. We are inclined to agree. Undenied accusations are admissible against an accused when made under circumstances where his silence tends to indicate a consciousness of guilt. (*People* v. *Davis*, 43 Cal.2d 661 [276 P.2d 801].)

 Throsby testified that when he said to appellant "I believe you did away with her" appellant did not reply. But this took place during the conversation in which appellant had asserted that his wife had disappeared, she had been back to the house, he did not know where she was, he had been questioned by the police and that that was all he was going to say about it. His statements considered in their entirety could not reasonably have been construed as indicating a consciousness of guilt. They were an effectual denial that he had made away with his wife. In view of appellant's steadfast denials of guilt the jury could not have seen in any of the conversations with Throsby a manifestation of a consciousness of guilt. Although we are of the opinion that the instruction should not have been given, it is clear that no harm could have resulted from it.

 Appellant requested an instruction which embodied 18 of the presumptions listed in section 1963 of the Code of Civil Procedure. Many of them were given. Error is asserted in the failure of the court to instruct on the presumption "that a thing once proved to exist continues as long as is usual with things of that nature" (Code Civ. Proc., § 1963, subd. 32). This presumption, it is said, was applicable to the question of Mrs. Scott's survival. The jury had been instructed as clearly as could be that appellant could not be convicted unless the proof established beyond a reasonable doubt that Mrs. Scott was murdered. Absent that degree of proof the jury should find that she was still alive. There was no error in refusing the instruction.

In our study of the evidence we have found no reason for questioning the correctness of the verdict. Although, as we have said, the case is factually without precedent, it is not without precedent in principle or in the law, which allows death to be proved by circumstantial evidence. Appellant wove about himself a web of incriminating circumstances that

was complete. He has evolved from the evidence no theory of innocence; the jury could not find such a theory, nor can we. Appellant merely says, and others may say, "But Mrs. Scott may still be alive." They would have to rest their belief upon some mythical or miraculous hypothesis, since it could not find support in any reasonable deduction from the established facts. But the law is reason; it does not proceed upon fantasy or remote and unrealistic possibilities.

Because of the multitude of material circumstances established by the testimony of many witnesses and documentary evidence, we have gone to unusual lengths in our statement of the record. The undisputed facts point unerringly to a single conclusion. The evidence of appellant's guilt was convincing. We can only regard the verdict as a reasonable and just disposition of the charge that appellant murdered his wife. He was accorded a fair trial. The errors we have mentioned were trivial and manifestly harmless. There is no reason for disturbing the judgment or order.

The judgment and the order denying motion for a new trial are affirmed.

Vallée, J., and Ford, J., concurred.

A petition for a rehearing was denied January 7, 1960, and appellant's petition for a hearing by the Supreme Court was denied February 17, 1960.