[Crim. No. 3133. Third Dist. Sept. 13, 1961.]

THE PEOPLE, Respondent, v. LARRY LORD
MOTHERWELL, Appellant.

Reges and Reges and Robert A. Fugazi for Appellant.

Stanley Mosk, Attorney General, and Doris H. Maier, Assistant Attorney General, for Respondent.

VAN DYKE, P. J.—This is an appeal from a judgment and from an order denying motion for a new trial in a case wherein appellant was convicted of murder in the first degree. Appellant was indicted by the grand jury of Sierra County, the indictment charging a violation of section 187 of the Penal Code in that "on or about the 15th day of August, 1958, in the County of Sierra, State of California, he did wilfully, unlawfully, feloniously and with malice aforethought murder Pearl Lida Putney, a human being."

We will adopt the statement of facts presented in respondent's brief as follows:

Pearl L. Putney was a woman of approximately 72 years of age, 5 feet, 2 inches in height, in exceptionally good health for her age, quite active, and had driven her own automobile

on extended cross-country trips. She had formerly been married to Dr. Albert Putney, who died in 1929. He had been a member of the State Department, had traveled extensively in Europe and especially in Czechoslovakia, was active in Masonic bodies; and as a result of this marriage, Mrs. Putney had many contacts in Washington, D.C., and with people in diplomatic circles. Her mother was Ida Meek Dabrohua. The closest living relative at the time of Mrs. Putney's disappearance was a half brother, Castro Meek Dabrohua, who lived in Winnetka, Illinois, with his wife, Eleanor. For a number of years prior to her disappearance, Mrs. Putney resided in a cooperative apartment house at 3024 Porter Street, Washington, D.C., with her mother. Mrs. Putney was very close to her half brother. They frequently corresponded and were often in contact by telephone. Several times each year they would see each other, either as a result of Mrs. Putney and her mother driving to Winnetka, or of Mr. and Mrs. Dabrohua going to Washington, or of all of them meeting for extended vacations in Florida. Mrs. Putney was a prolific letter writer, in constant touch through the mails with various relatives and friends who were scattered throughout the United States.

Mrs. Putney and her mother had been under the care of Dr. Roy Sexton, of Washington, D. C., for a number of years. Dr. Sexton testified that Mrs. Putney was in good health and had periodic checkups and that an electrocardiogram which had been done on her in 1955 showed a completely normal heart. She was also a patient of a dentist, of Washington, D. C., for a period of 30 years.

Appellant Motherwell first met Mrs. Putney in the year 1949 when he took an apartment in the same cooperative apartment building where Mrs. Putney and her mother resided. He became friendly with the two women, and while residing at the apartment for only about a year, the appellant nevertheless continued his contact with these two women until the death of Mrs. Dabrohua in June 1957, and thereafter continued his contact with Mrs. Putney. At one point in 1955, the defendant stayed in the apartment of Mrs. Putney and Mrs. Dabrohua while the two women were on a trip to Florida. During the early period of his contact with these women he appears to have been employed in the construction industry.

For a period of several years prior to June 1957, Mrs. Dabrohua was intermittently ill, and during the last six

months prior to her death she was quite infirm, and Mrs. Putney spent the major part of her time caring for her mother at the apartment in Washington. At the time of her death, Mrs. Dabrohua held certain properties jointly with Mrs. Putney and held in her own name a considerable number of stock shares. All of her holdings passed to Mrs. Putney under the probate of her estate, which was probated by Mr. Reges, the present defense counsel.

Following the death of her mother, Mrs. Putney appeared to have begun to enjoy a certain amount of freedom which she had theretofore not had because of the problem of caring for her mother. The appellant's appearances at the Putney apartment became more frequent. The defendant was introduced to friends and neighbors of Mrs. Putney as Dr. Motherwell, a retired naval officer who was involved in some highly secret work for the Government. The appellant at this time was married to his third wife, Josephine, and resided in Washington, D. C.

Early in 1958, Mrs. Putney, while taking a course of dancing lessons at the Arthur Murray Studios in Washington, D. C., stated to her instructor that she was contemplating marrying a man who was a doctor and a very brilliant man, but who was considerably younger than she, and asked the dance instructor's advice.

On May 14, 1958, Mrs. Putney closed out a savings account at the National Savings and Trust Company in Washington, D. C., by withdrawing some $2,400 in cash. At the same time she purchased a draft on the Wells Fargo Bank of San Francisco for $1,125, indicating an intent to travel to the West Coast. This draft was subsequently cashed in Washington, D. C., in June. In June 1958, Mrs. Putney closed another savings account by withdrawing $2,400 in cash. Also in that month she unexpectedly announced to her neighbors that she was selling her apartment and leaving; and a meeting of the owners of the cooperative was held at which the appellant took charge and did all of the talking for Mrs. Putney. The lady who purchased the apartment from Mrs. Putney testified that in negotiating for the sale of the apartment, Mr. Motherwell was very much in evidence and handled the deal for Mrs. Putney. Mrs. Putney also sold her automobile and advertised various items of jewelry and furniture for sale. All of this activity by way of liquidating her assets and selling her apartment was done in apparent haste, not in accordance with

the rules of the cooperative, and all appeared to be done under the direction of the defendant Motherwell.

A jewelry salesman testified that he endeavored to purchase some jewelry and antiques from Mrs. Putney, but that she would make no sale without the approval of the appellant. He testified further that there were some items of garnet jewelry which he observed among the jewelry that Mrs. Putney had, as well as some jewelry of considerable value. He further testified that there were some items of jewelry which Mrs. Putney would not sell under any circumstances because of their great sentimental value, having some connection with her deceased husband and mother.

On June 24th, the appellant appeared at the Union Trust Company in Washington, D. C., a bank in which Mrs. Putney had another account, with a letter from Mrs. Putney directing the bank to cash six checks totaling about $6,000. These were the checks from the proceeds of the sale of the apartment and automobile. The appellant was alone, endorsed the checks, and took the cash from the bank. Three days later, the appellant and Mrs. Putney appeared together at this same bank, closed out a safe-deposit box which Mrs. Putney had and endeavored to close out a savings account which had a balance of about $6,009. They indicated at the time an intention to go to Sarasota, Florida. The banker refused to close the account at that time, but indicated that he would forward the money to Sarasota, closing out Mrs. Putney's account at that time.

In early June 1958, just prior to all of this activity, Mrs. Putney visited in New York with her brother, Castro, and his wife. On that trip Mrs. Putney told Mrs. Dabrohua that the appellant's wife, Josephine, had been unfaithful and that Motherwell was divorcing his wife; that the FBI was getting the information on the wife to assist in the divorce. She also told Mrs. Dabrohua that Mr. Motherwell was a brilliant man, working at Cape Canaveral in an advisory capacity. When Mrs. Dabrohua remarked that this was ridiculous and that the FBI would not be involved in a domestic situation, Mrs. Putney "clammed up" and no further mention was made of the appellant. Mrs. Putney had previously told one of her neighbors that Mr. Motherwell's marriage was not working out and that he was going to get a divorce.

During the period which followed the meeting of the cooperative owners and at the time of the departure from Washington by Mrs. Putney on July 1st, appellant appeared to be constantly at the apartment. On a couple of occasions when

neighbors endeavored to see Mrs. Putney and discuss her departure, the appellant would answer the door and refuse to permit them to see her. The jewelry buyer had a similar experience when he returned to purchase some jewelry. The appellant appeared at the door and in effect slammed it in his face.

At the end of June, the appellant contacted a moving and storage concern and arranged to have them come out and move Mrs. Putney's furnishings to storage; he later signed the storage receipt telling the movers that Mrs. Putney was going to Arizona for her health. During the time the moving was being conducted, Mrs. Putney had stated that the speed with which all of the events were happening was not to her liking and that it was only because movers were so hard to get, and that Mr. Motherwell had been able to get a mover on short notice due to a cancellation. According to the movers this latter was untrue.

About July 1, 1958, the appellant and Mrs. Putney departed from Washington, D. C., in the appellant's automobile, stopping at motels enroute and arriving in Sarasota, Florida, several days later. At the motels, the appellant signed the register either Mr. and Mrs. or Dr. and Mrs. L. L. Motherwell.

In Sarasota, the appellant and Mrs. Putney visited some friends who lived across from a vacant lot owned by Mrs. Putney. Mrs. Putney had this friend show the appellant the floor plan of the house and stated to one Mrs. Wagner that she and Dr. Motherwell were going to get married and would possibly return and build a home in Sarasota.

From Sarasota, the two continued across the United States through New Orleans, Corpus Christi, Texas, Flagstaff and Kingman, Arizona, ultimately arriving in Las Vegas on August 4, 1958. Prior to leaving Sarasota, Florida, Mrs. Putney drew out of the bank $13,200 in cash.

On August 4, 1958, Mrs. Putney secured a post office box in Las Vegas, Nevada. Up to that point she had corresponded frequently with her half brother and other friends. She wrote to two friends in California, indicating an intent to visit in Culver City and Del Mar, and she also indicated an intent to ultimately return to Chicago to visit her half brother some time in late August. Throughout the trip, in her correspondence, Mrs. Putney constantly advised people to write to her, giving them general delivery addresses in cities she intended to pass through. A postal inspector from Las Vegas testified that the post office box which was opened August 4th continued

in the name of Mrs. Putney until late in the year 1958 and when opened by the postal authorities it contained unclaimed mail which had accumulated since about August 12th. The mail contained dividend checks from stock holdings, social security checks, and personal correspondence from relatives and friends. In her correspondence Mrs. Putney also concealed from her relatives and friends the fact that she was with the appellant and referred to her travels as being with a group of friends.

On August 14, 1958, the appellant registered the two under the names of Dr. and Mrs. L. L. Motherwell in the Town House Motel in Marysville, California. That same evening, Mrs. Putney and the appellant were seen by a druggist in his store in Marysville where Mrs. Putney purchased some post cards. Two post cards were received by friends and relatives postmarked Marysville, California, August 16, 1958. Both to the druggist and in her correspondence, Mrs. Putney expressed an intent to return to Las Vegas from Marysville.

This was the last time anyone, except the appellant, heard from or saw Mrs. Putney.

On the morning of August 16, 1958, the appellant appeared alone in Reno, Nevada, and purchased a round-trip airlines ticket from United Air Lines from San Francisco to Washington, D. C. At about 4 p. m. on that same day, the appellant arrived alone at the San Francisco airport. He sent a telegram to the half brother in Winnetka, Illinois, from the San Francisco Airport at 7:30 p. m. on August 16th, supposedly written by Mrs. Putney, announcing that she was getting married and going on an extended honeymoon in Mexico and was expecting to take a trip on a yacht and would not be heard from for some time. The telegram was made out by the defendant in his own handwriting and signed "Pearl."

That same evening the appellant flew from San Francisco to Washington, D. C., leaving his car at the San Francisco airport parking lot. On August 18th he deposited $2,000.

On August 27th the appellant was contacted by Mrs. Dabrohua by telephone, at which time she told him of the telegram and stated that they were concerned over the whereabouts of Mrs. Putney. Appellant indicated to Mrs. Dabrohua that he knew nothing of the telegram, but stated that he had accidentally run across Mrs. Putney in Sarasota, Florida, and that she had told him that she was getting married and that she had introduced him to the intended bridegroom. He de-

scribed the man as one who had been at the funeral of the mother, Mrs. Ida Dabrohua, and the description he gave fit only one man at the funeral. That man was Domingo Paniagua, a longtime friend of Mrs. Putney. Appellant assured Mrs. Dabrohua that Mrs. Putney was happily married and that everything was all right.

On that same day appellant took an airplane with his wife and child and flew back to San Francisco. On August 31st he appeared in Las Vegas with his wife and child, registering at a motel as Dr. and Mrs. L. L. Motherwell. He then took a long cross-country motor trip with his wife and child, arriving in Washington, D. C., in mid-September.

By this time the Washington Metropolitan Police had opened a missing person's case on Mrs. Putney, and they contacted the appellant. On September 19th the appellant was interviewed by the Washington police, at which time he said he had helped Mrs. Putney sell her automobile and apartment and aided in settling her affairs before departing from Washington; that in his field work he had run into Mrs. Putney in Corpus Christi, Texas, around July 29 or August 1, 1958; that he had met a man she was going to marry; that she was traveling with a family named Barr; that this man she was going to marry had attended her mother's funeral and was a longtime friend of Mrs. Putney. On the same day appellant deposited another $500 in his bank account. On October 8, 1958, the appellant appeared in Miami, Florida, at which time he sold for $1,125 the automobile in which he had been traveling with Mrs. Putney.

On that same day he deposited a suitcase containing numerous items of jewelry belonging to Mrs. Putney on the doorstep of a former friend of his named Hilda Ray, who resided in Miami. He left a letter with this suitcase, indicating that it was junk that had come from an old house of his; that the house had been torn down, and that he wanted to get rid of this jewelry. In this suitcase were numerous items such as tennis medals belonging to Dr. Putney, Masonic jewelry belonging to Dr. Putney, unique items of jewelry from foreign countries—some of which had been gifts from a Mrs. DeLambert, who resided in Del Mar, California. Mrs. DeLambert, whose husband had also been connected with the State Department and a friend of Dr. Putney, testified this jewelry had been retained by Mrs. Putney for many years. There were such things as bracelets from Peru, brooches from Tahiti, an old-fashioned gold watch belonging to Mrs. Putney's mother;

things to which Mrs. Putney had obviously attached some sentimental significance. A small box, hand-made, which had been a gift in 1923 from relatives, was also in the collection, along with some coins and currency from Czechoslovakia and other European countries.

On October 9th, appellant purchased passage on an Eastern Airlines plane from Miami to Cleveland under the name of Bill Ray. Aboard the plane he met one Evelyn Dougherty and told her that he was a correspondent for the United Press, on his way to Cleveland to cover a big news story; that he had been in Korea; that he had been a prisoner of war; that his name was Arthur Rivers.

On his arrival in Cleveland he kept in contact with Miss Dougherty, and on October 27th he appeared in Detroit, Michigan. A cab driver testified that the appellant asked him where in Detroit he could buy a new car. The cab driver took him to a Plymouth dealer in Detroit, and when the appellant opened his wallet to pay his cab fare, the cab driver noticed that the smallest bill he had was for $10 and that he had a large number of $100 bills; that the stack of money in the wallet was at least an inch and a half thick. On the following day, the appellant took delivery of a 1959 Plymouth station wagon, paying $3,300 in cash for the car.

He returned to Cleveland in early November, proposed marriage to Miss Dougherty and told her that he had no wife or family anyplace. He then produced from his pocket a small chamois bag in which Miss Dougherty noticed he had some diamond rings. He produced from this bag a garnet necklace, which was established as belonging to Mrs. Putney, gave it to Miss Dougherty as an engagement present and told her that it was an old family heirloom belonging to his deceased grandmother. He then drove Miss Dougherty from Cleveland to Florida and subsequently across the United States through New Orleans, Corpus Christi, and Arizona, to California.

He then went with Miss Dougherty to Las Vegas, where he spent several days with her and then returned with her to Laguna Beach, California. He made a present to her while in Laguna Beach of three cameos which were out of their settings, but which were identified as having belonged to Mrs. Putney. He told Miss Dougherty that he was leaving for the Orient and would return to marry her after he had finished the mission to which he had been assigned. Before leaving her, he borrowed $2,000 from her, ostensibly for the purpose of

paying his income tax. He left her in Laguna Beach and that was the last time she saw him.

On January 18, 1959, the appellant was arrested in Las Vegas, Nevada, where he had been for approximately five weeks. At that time he told the police that his name was Arthur Rivers. He had $1,600 in cash on his person. When questioned by the officers, he finally admitted his name was Motherwell and admitted having been on a trip with Mrs. Putney, but denied having been to Marysville with her or having sent the telegram.

Under questioning he told the police that he was using the name Arthur Rivers because Mrs. Putney had told him to use that name and to meet her in Las Vegas around Christmas of 1958 or January 15, 1959, and that was his reason for being in Las Vegas at that time. He told the officers that he had been hired by Mrs. Putney as a chauffeur; that he had registered as Dr. Motherwell at various motels and that the Dr. in front of his name stood for ''Driver''; that he had been paid approximately $6,500 by Mrs. Putney to chauffeur her across the country.

Appellant, after being confronted with the registration card from the Marysville motel, stated that he had taken Mrs. Putney to Marysville at her request, but that on the 15th of August he had returned with her to Las Vegas. He stated that he let her out on a street in Las Vegas and went to get his car serviced at a Chevron service station on Fifth Street. He stated he gave Mrs. Putney a card with the name and phone number of this service station and that while he was having his car serviced he got a call from Mrs. Putney asking him to meet her at the Fremont Hotel and to bring her suitcases. At that time, and as a complete surprise to him she announced she was marrying a man by the name of D'Avious. He stated that this man had been at the mother's funeral, was in his sixties, a Latin connected in some way with international law, and was a longtime friend of Mrs. Putney. He stated that he had met this D'Avious on the trip with Mrs. Putney in Sarasota, Florida, New Orleans, and Corpus Christi, and that he assumed this man had followed Mrs. Putney on to Las Vegas. However, he had not seen him in Las Vegas.

He said that Mrs. Putney gave him several instructions, one, to go to Miami, Florida, and mail a letter before November 1st; two, to go to Flagstaff, Arizona, and contact a man named Carson; three, to purchase a new automobile, assume the name of Arthur Rivers, and return to Las Vegas and wait

for her. He said that he then left Mrs. Putney standing on a street corner in Las Vegas at about four or five in the afternoon of August 15th and that he, Motherwell, had gone to Flagstaff, Arizona, looked for Mr. Carson, spent the night in Flagstaff, and then continued on to El Paso when he was unable to find Mr. Carson.

At that point he was confronted with the telegram which had been sent from San Francisco, and he denied sending it. When shown that the telegram had been originally printed in his own handwriting he then admitted that he had sent it from San Francisco and that he had not told the truth when he said that he had gone to Flagstaff and El Paso. He then stated that what really happened was that in addition to the other instructions Mrs. Putney had given him she had dictated a telegram to be sent from Los Angeles; that her reason for having the telegram sent from Los Angeles was to give her a head start on her half brother whom she did not want interfering in her affairs. He stated that he started from Las Vegas to go to Los Angeles to send the telegram, but that he then decided because his wife had friends in Palo Alto she might like to visit, he would go to San Francisco and fly back to Washington, pick up his wife and return to the San Francisco area; that he headed north through California via Barstow and Highway 99, stopping to sleep in his car for a few hours, arriving at San Francisco on August 16th, sending the telegram and boarding the airplane. He admitted that the reason he had not told of sending the telegram until it was shown to him was because he felt that it might incriminate him. He said he had not known whether or not the officers were "running a bluff." He still maintained that Mrs. Putney had hired him as a chauffeur, had paid him about $6,500 for this service, and that he expected her to show up in Las Vegas.

It was established through the testimony of a Professor Stewart, of friends and relatives of Mrs. Putney and of police officers from Washington, D. C., that there is no such person as D'Avious.

After his conversations with the officers in Las Vegas, the appellant was questioned on January 27th by Captain Mahaney of the Washington Metropolitan Police, who testified that in the conversation Motherwell gave a version of his activities which varied in some details from his previous statements. He stated that this man D'Avious, when he had met him, had been in the company of some people by the name of Barr and one Manuel Laguna. In the conversation the officers

questioned him about his income and costs of living since he had last seen Mrs. Putney, as well as various other expenditures. The only income appellant claimed was the $6,500 from Mrs. Putney and when it was pointed out that he had spent over $11,000 since last seeing Mrs. Putney he refused to answer any more questions.

Appellant, when he was asked the specific question if Mrs. Putney had left any of her personal belongings or effects with him, said ''No.''

On June 26th the appellant pawned some unset diamonds in Atlanta, Georgia, under the name of Allen Michel DuBar. Two of these diamonds were identified as coming, one from Mrs. Putney's engagement ring which had been given to her by her husband in 1910, and the other from a ring which Mrs. Putney had worn for many years. The same witness who identified these diamonds also testified that the other diamonds in the group, while they could not be positively identified by her, were of the same shape and size of diamonds which she had seen in rings belonging to Mrs. Putney. She further testified that Mrs. Putney had for many years carried her better jewelry in a small chamois bag pinned to the inside of her clothing.

On June 27, 1959, appellant wrote a letter to the United States Immigration Service seeking information concerning his passport out of the United States.

On August 16, 1959, in a remote forest area near the Yuba Pass in Sierra County, one Mrs. Alma Freemen, who was hunting pine cones, came across a human skull. She notified the highway patrolman in the area and turned the skull over to him and led him back to the point where she had found it. In searching the area, the patrolman picked up a lower jaw intact, an upper denture, some small bits of cloth which were wadded and matted, and observed a compact pile of bark and brush leaning across a large log nearby. This pile of brush was in the form of a ''lean-to'' against the log and was not a natural collection of forest debris. One Chester Butz, an expert woodsman and animal trapper, testified that this pile of brush and bark could not have been placed there by animals, nor by natural phenomena. He further testified that the bones which were ultimately recovered had been gnawed on by small animals. The highway patrolman returned to the main highway and summoned members of the sheriff's office, and they all returned to the area and collected various bones. They were unable to find any weapons, clothing, items of

identification, shoes, metal fasteners or buttons. Upon removing the lean-to from the side of the log, they observed an impression on the ground in the shape of a human body. This impression was outlined by a mold on the ground which was the result of decomposition. They also found a large quantity of human hair under the lean-to.

Undersheriff Hill of Sierra County at a later date returned to the area, and at a spot just off the road about a half mile from where the remains were found he examined the remnants of a fire from which he removed a small fragment of cloth. Roger Greene, a criminologist, testified that the fragment of cloth from the fire was the same cloth as the fragments found near the remains; that the matting of the cloth found near the remains indicated the presence of an organic substance in the cloth, and that in his opinion this cloth had been in contact with the body during the decomposition period. This small wad of cloth was found close to the upper denture and in a line in which were found the denture, the cloth, the lower jaw, and the skull. All indicated that an animal had dragged the skull from under the lean-to, that the plate had fallen out and that the lower jaw had fallen off as the skull was being dragged. Mr. Greene testified further that the broken teeth in the upper denture showed evidence of organic material clinging to the denture, and, in his opinion, this meant the denture had been in the mouth for a time after it was broken and could not have been caused by the action of animals attacking the body after death.

The bones were examined by Dr. Ridge, a qualified pathologist, who testified that they were those of a small female upwards of 65 years of age, of a height of between 5 feet 1 and 5 feet 4. The hair was established by Mr. Greene as being basically gray in color, with some artificial tinting, and as being human hair. The cloth was identified by Mrs. Dabrohua as coming from a dress belonging to Pearl Putney. The dentist, Dr. Bele, identified the lower jaw and upper plate as those belonging to Mrs. Putney, and testified further that he had last seen her in May, 1958, at which time the upper plate was in perfect condition. Mrs. Dabrohua testified that Mrs. Putney had gray hair, but did use an artificial tinting on it from time to time.

On August 25, 1959, appellant was arrested by special agents of the FBI at the airport at Atlanta, Georgia, as he was preparing to board an airplane for Cleveland. When approached by the FBI he told them his name was Craig DuBar

Foster; that he was not Motherwell. However, when the agents exhibited a photograph of Motherwell to him he then admitted he was Motherwell.

Appellant then recounted to the FBI agents a story concerning his trip with Mrs. Putney. He told of meeting some friends of Mrs. Putney, a Mr. and Mrs. Barr, in Corpus Christi, Texas, and that these Barrs owned a yacht, and he and Mrs. Putney had stayed aboard this yacht when it was anchored at the municipal pier at Corpus Christi.

Concerning the trip from Marysville to Las Vegas, he told the agents at this time that on returning to Las Vegas they had stayed two or three days until about the 18th of August, at which time Mrs. Putney had discharged him and he had gone his way. In a search of the defendant's room in Atlanta, the agents recovered the pawn ticket for the diamonds under the name of Allen Michel DuBar, together with an inventory, placing a valuation of $1,100 on the diamonds, all in appellant's handwriting; numerous items of identification, such as social security card, driver's license, etc., in the name of Allen Michel DuBar; a complete typewritten biography of Craig DuBar Foster; and five handwritten sheets of paper purporting to be a letter written by a priest concerning Craig DuBar Foster. These five sheets contained several names which were all of a French type, with an apostrophe after the first letter similar to the name D'Avious.

On September 4th the appellant was interviewed by Special Agent Horton of the Bureau of Criminal Identification and Investigation, at which time the appellant told him that on his return to Las Vegas from Marysville he had registered at the TraveLodge Motel, stayed one night, and had then traveled to San Francisco, via Barstow and U. S. 99. The appellant stated that he knew Mr. Paniagua, but that the man Mrs. Putney married was not Paniagua; he was a man named D'Avious, who looked just like Paniagua.

Detective Hal Green of the Corpus Christi Police Department testified that he had checked on anchorages and dockings in the Corpus Christi area for the months of July and August 1958, as well as the fuel supply docks. All of these places kept records, but nowhere could he find any indication of a boat belonging to anyone by the name of Barr.

Mike Whitney of the Las Vegas Police Department testified that there was no record of any registration in the TraveLodge Motel in Las Vegas for the date alleged by appellant. He also checked every Chevron service station on Fifth Street in Las

Vegas from city limit to city limit and found no record of the defendant's having had a car serviced on August 15, 1958.

Miss Marie Colley, of Roanoke, Virginia, testified that in October 1957, a time prior to appellant's trip with Mrs. Putney, the appellant told her he was going to divorce his wife, Josephine, and marry her. Relying on this representation, she accompanied him on a trip which took them to Florida. When they arrived in Florida they rented an apartment and appellant told her he was engaged in secret government work and was constantly in the company of bodyguards, one of whom was called "The Dagger." After being in Florida for a short while with Miss Colley, the appellant disappeared, and shortly thereafter she received a telegram signed "The Dagger," saying that Motherwell had been killed and his ashes scattered over the Everglades. Miss Colley then returned to her home in Roanoke. About two weeks later the defendant reappeared, saying that the telegram was a mistake and that it was his twin brother who had been killed. The appellant told her that the divorce laws of Florida had been changed and they would have to go West for the divorce, so she accompanied him on a trip which took them across the southern part of the United States into Las Vegas and California. She testified they started toward Reno so he could get a divorce, taking Highway 40 to Donner Summit, at which point they turned back because of snow. Appellant then went to Marysville, California, and took the Feather River Canyon route through the Sierras into Reno. During this trip through the Feather River Canyon, the appellant stopped the car near a large cliff so they might look over the side of the canyon. She did not go near the edge and she was reluctant to look over because the ground was slippery and wet, but appellant indicated there was no danger.

Appellant's divorce from his wife and marriage to Miss Colley never took place and appellant abandoned Miss Colley in Richmond, Virginia.

As shown by the road maps which were offered in evidence, by taking the Feather River Canyon route from Marysville, when one reaches the eastern side of the mountains there is a road which runs south to the town of Sattley in Sierra Valley, and it is a very short distance from this intersection at Sattley to the road into Turner Canyon where Mrs. Putney's remains were found.

The appellant in his testimony indicated that Mrs. Putney, after the death of her mother, began drinking, and had set out on a plan to lure him to Sarasota on the pretense of having

him build some houses; that he was hired strictly as a builder and adviser; that the money which was paid to him was about $7,800. He stated that he was lured into moving West from Sarasota by Mrs. Putney's statements that she had friends who were interested in his ideas about construction and that she wanted him to look over properties all through the United States.

The appellant further stated that during the trip, once at New Orleans and once at Marysville, Mrs. Putney while in a drunken state threw herself at him sexually; that while at Marysville he was so shocked by the whole episode that he told her he would have nothing more to do with her, and he drove her back to Las Vegas.

Appellant then testified that he left Mrs. Putney in Las Vegas and drove, during the night of the 15th, toward Reno. This was along a route he had theretofore not referred to. He testified that he slept in his car during the night of the 15th and arrived in Reno the morning of the 16th and purchased the airline ticket.

He testified that he used the name "Rivers" at Mrs. Putney's suggestion and that likewise all of the representations concerning his secret government work were made at her suggestion.

He testified that the boat incident in Corpus Christi was nothing more than a cocktail party on a boat; that some people by the name of Barr were present; that he did not know who owned the boat and could not recall the name of anyone present with the exception of Mr. D'Avious. He made a studied attempt at misrepresentation of names throughout his testimony, referring to Miss Colley as Miss Collier, to Miss Dougherty as Miss Doggerty, and consistently mispronounced the Dabrohuas' name—apparently in an attempt to show that there was a person such as D'Avious, but that the spelling and pronunciation might be incorrect. Appellant conceded the truth of every fact presented by the People with a few significant exceptions. He conceded that he had made all of the false accounting attributed to him concerning Mrs. Putney's whereabouts; that he had given the jewelry away as indicated; that he sent the telegram; that he had adopted all of the fictitious identities. He admitted writing the letter concerning the passport and that the use of the name of Arthur Rivers was his own idea. He stated that he could not remember the names of any persons he met on this trip with Mrs. Putney except the Barrs and Mr. D'Avious. He con-

ceded that Mrs. Putney had a large amount of money, stock certificates and jewelry with her when he last saw her alive, but contended that that place was Las Vegas, Nevada. He contended that the diamonds he pawned were diamonds he had obtained from other people throughout his life as investments, but said he could not remember from whom he obtained them. He denied having the chamois bag. He claimed that the jewelry he gave to Hilda Ray was junk jewelry which Mrs. Putney had left in the automobile, with instructions for him to give it to his wife, Josephine. He contended that his reason for returning to Las Vegas in January 1959, was not to wait for Mrs. Putney, but to run into some people who had been at the cocktail party in Corpus Christi, whose names he did not know, but he had heard them talk about the Baghdad Inn in Las Vegas and figured that if he sat around there long enough they might show up.

Respondent presents the following as a simple computation of the defendant's expenditures and income during the vital period:

Deposit in bank .......................... $ 4,700.00
Payoffs on car ........................... 2,000.00
Purchase of new car ...................... 3,300.00
Airline tickets .......................... 400.00
Living costs for the one-year period following his leaving Mrs. Putney ................. 7,200.00
Cash on his person at time of arrest in Las Vegas 1,600.00

Approximate total spent and on hand ...... $19,200.00

Appellant's only exhibited income, says respondent, for the same period was $900 in his bank balance, $2,000 received from Evelyn Dougherty, $250 from the pawning of the diamonds, and $1,125 from the sale of his car, a total of $4,275, leaving him with a net unexplained profit for the year of $14,925.

During the period of May 14, 1958, to August 15, 1958, it was shown that Mrs. Putney had drawn out of various bank accounts in cash a total of approximately $23,000. The largest figure that the defendant ever contended he received from Mrs. Putney by way of salary was $7,800.

 Appellant's principal contention on appeal is that the evidence was insufficient to justify a verdict of first degree murder, in that the prosecution proved neither a killing in the perpetration of or attempt to perpetrate robbery, nor a wilful, deliberate and premeditated killing. The prose·

cution, at the trial contending that the evidence showed either a killing in the perpetration of robbery or a wilful, deliberate and premeditated killing, and that the evidence would not justify either a verdict of second degree murder or of manslaughter, requested, and the court gave, an instruction that ''the evidence in this case is such that either the defendant is innocent of the charge of murder or he is guilty of murder in the first degree.''

We think it apparent from the record that there was here no proof of facts or circumstances from which the jury could find that the killing was accompanied by a clear, deliberate intent to take life, or that the killing was done in the perpetration of robbery. The People introduced evidence, closely connected in point of time with the killing of Mrs. Putney, that appellant had unlawfully obtained property of two other women, the general method of operation being the same in all three cases. There was the same romantic approach, the same hint or promise of marriage, the same inducement to the woman to accompany appellant on extensive automobile trips about the country, during which time the couple would stay in motels or hotels, registering as husband and wife. In each of the other two cases when appellant had obtained money or property from the woman he would abandon her, apparently depending upon her fear of public shame and ridicule to keep her quiet and prevent her from having him prosecuted. As has been shown, Mrs. Putney was a great deal older than appellant. She knew that appellant was married and had a young child; she knew that he was willingly, if not eagerly, aiding her in accumulating a large sum of cash. Her background was that of a decent, intelligent woman who habitually associated with people of her own class and kind and who, in view of these things, and of her advanced age, would never be expected to suddenly violate the precepts of her lifetime and go off with appellant on a long, rambling trip during which they traveled as man and wife while in all her voluminous correspondence with her relatives and friends she concealed from them the fact of her relations with appellant. Nevertheless, this was the pattern of her behavior, and though it is a fair inference that her conduct was to be ascribed to the inducements of appellant, yet the record shows not a plan of murder but the proven pattern of a ''confidence man'' following out a customary mode of operation to enable him to fraudulently procure her property. Appellant might well have been convicted of theft through fraud, but nothing he

did before the death of Mrs. Putney will support an inference that he planned or accomplished the acquisition of her property by robbery or that he planned or accomplished a cold-blooded and premeditated murder.

"Where a first degree murder charge is based on the allegation that the homicide was committed in perpetration or attempted perpetration of one of the felonies enumerated in Penal Code § 189, proof of the independent felony is essential to a conviction of first degree murder (*People* v. *Ballentine,* 39 Cal.2d 193, 246 P.2d 35), and the elements of the independent offense must be proved . . . . (*People* v. *Coefield,* 37 Cal.2d 865, 236 P.2d 570.) For instance, any specific intent required for the independent felony must be proved. (*People* v. *Coefield, supra*—specific intent to rob; *People* v. *Rupp,* 41 Cal.2d 371, 260 P.2d 1—case of first degree murder because of attempted rape; controlling inquiry was whether defendant was mentally capable of forming intent to commit rape.) And where the homicide is alleged to be first degree murder because committed in an attempt to perpetrate one of the felonies listed, to obtain a conviction of first degree murder it must be shown that the defendant's action concerning the independent felony went beyond the stage of mere preparation." (25 Cal.Jur.2d § 81, p. 587.)

It is equally true that to prove first degree murder on the theory the killing followed an intent to kill arrived at by deliberation and premeditation, the proof must be sufficient from the facts and circumstances in evidence to warrant a reasonable inference that the necessary deliberation and premeditation had taken place. (*People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8].) In the *Bender* case the defendant had killed the woman with whom he had lived for some time after a marriage ceremony void because of his existing marriage to another. The circumstances were held sufficient to uphold a conviction of murder of the second degree, but not a conviction of first degree. The Supreme Court held that (pp. 186-187) :

". . . [T]here is no substantial evidence from which it reasonably can be inferred that defendant either formed or carried out the intent to kill deliberately, and with premeditation, in the ordinary meaning of those words. . . . The evidence, however, amply supports the other findings necessarily implied in the verdict of the jury. The error in instructing as to the degree of the homicide does not enter into the finding

that defendant is guilty of 'the unlawful killing of a human being, with malice aforethought' (Pen. Code, § 187) . . . .

"For the reasons above stated the judgment is modified by reducing it to murder of the second degree. . . ."

In *People* v. *Mendes*, 35 Cal.2d 537 [219 P.2d 1], the defendant, together with two others, had embarked upon an evening of beer drinking in Grimes, California. A stranger joined the group and quarreled with Mendes. Later on, and after a second argument, Mendes was observed to have a gun and was asked to leave the café, which he did. He was seen to point a gun at the stranger who was being led out of the café and to a shack for the purpose of sleeping. A deputy sheriff was called who deputized his son, and the two went to the café. As the officers arrived, Mendes started to retreat around the side of the building and the deputy sheriff's son ran after him and shouted at him. In the course of the first six or eight seconds of his retreat Mendes fired two shots in rapid succession, the second of which struck the deputy's son, killing him. Mendes testified that his life had been threatened and the gun had been given to him by one of his companions for his self-protection; that during the second argument at the café the stranger displayed a knife and indicated he intended to use it; that Mendes had retreated under the impression that the stranger had returned and when he heard running and shouting behind him he had fired two shots without aiming and without intention of hitting anyone, but only through a wish to escape from what he feared was a murderous assault by the stranger. The Supreme Court held that the evidence was insufficient to support a conviction of murder in the first degree in that the murder had not been shown to be a "willful, deliberate, and premeditated killing." Said the court (p. 544) :

". . . The jury could have inferred that defendant shot at his pursuer thinking he was either the stranger or another. If they concluded that defendant knew his pursuer was not the stranger, they could only speculate on the question whether the shooting was, as the prosecuting attorney contended in his closing argument, in pursuance of a plan to kill if necessary to avoid arrest. The whole incident occurred within six to eight seconds. There is no evidence that defendant had any reason to fear the police, or that the deputy sheriff and his son were in uniform so that defendant might have inferred they were officers. Thus, if the jury believed that defendant knew his pursuer was not the stranger, the evidence would

sustain a conviction of no more than murder of the second degree. (Penal Code, § 189; *People* v. *Holt*, 25 Cal.2d 59 [153 P.2d 21]; *People* v. *Valentine*, 28 Cal.2d 121 [169 P.2d 1]; *People* v. *Bender*, 27 Cal.2d 164, 179 [163 P.2d 8].)''

Many other cases pointing up the necessity that there be proof of the required deliberation and premeditation in the formation of the intent to kill before an accused may be convicted of first degree murder might be cited, but the foregoing should be sufficient. If where facts and circumstances attending the actual killing, as in Bender, Mendes, and other cases, can be held to be insufficient to sustain a first degree murder conviction, how can it be said in this case, where there is no evidence whatever as to facts and circumstances of the killing, that a finding of deliberate and premeditated killing is sustainable? We think the judgment of first degree murder in this case cannot be sustained; that it is wholly unsupported as a judgment of first degree murder.

The People rely strongly on *People* v. *Scott*, 176 Cal.App.2d 458 [1 Cal.Rptr. 600], and it is apparent from the record that the prosecution here sought to model its case upon that decision. *People* v. *Scott* is readily distinguishable from this case on its facts. In *Scott* there was proof of a preconceived plan and purpose to kill, unitary in design and consistently followed. And so it was in *People* v. *Cole*, 47 Cal.2d 99, 106-107 [301 P.2d 854, 56 A.L.R.2d 1435], where the defendant killed his paramour with whom he had been living, the court saying on the question of first degree murder:

''. . . [T]he evidence was sufficient to show that defendant planned to implicate Mrs. Hill so as to secure her assistance in concealing his guilt and that he had formed this plan before committing the crime. It was established not only that he took her gun and used it in the killing but also that he brought the body to Mrs. Hill's home, represented that Mrs. Roberts had shot herself and asked Mrs. Hill to accompany him on the trip to Sutter County where he left the body in high grass beside the road. Defendant also requested Mrs. Hill to dispose of the gun used in the killing and instructed her not to disclose their activities but to give such an account of events as would substantiate his subsequent claim that he had last seen Mrs. Roberts driving away from a theatre with another man. Mrs. Roberts had been seen alive two hours before defendant brought her body, which was still warm, to Mrs. Hill's home. The taking of Mrs. Hill's gun during the preceding week and the speed with which defendant acted

following the killing would support the conclusion that his plan to involve Mrs. Hill had been conceived before the crime was committed.

". . . The jury might have determined that defendant had become dissatisfied with the relationship existing between him and Mrs. Roberts and that he planned to kill her in order to remove her as an obstacle to his plan of obtaining Mrs. Hill's property through marriage. . . .

"The evidence is sufficient to support the jury's finding that defendant was possessed of a willful, deliberate and premeditated intent to kill."

The record in this case is singularly barren of any proof that the killing was the product of a preconceived plan.

It is well to bear in mind that there is but one crime of murder, which is defined by Penal Code section 187 as "the unlawful killing of a human being, with malice aforethought"; and that the statutory purpose in dividing murder into two degrees was to secure greater punishment of murders of an aggravated nature or of those done in the commission of certain enumerated felonies. It follows that when murder has been proved, if the prosecution desires to lay the groundwork for the heavier punishment, proof must be made that will justify it and this is true whether the attempt to secure a first degree murder verdict or judgment be based upon one or another of the various grounds specified in Penal Code section 189. If it be claimed, as in part it was here, that the murder was committed in the perpetration of robbery, proof must be made of the taking of property through force or fear. If, as is alternately claimed here, the justification for conviction of first degree murder be that the killing was not only the unlawful killing of a human being with malice aforethought, but that it was accompanied by a wilful, deliberate and premeditated intent to take life, then proof thereof must be made.

". . . It is obvious that the phrases 'malicious intent' and 'malice aforethought' are not synonymous with 'willful, deliberate, and premeditated' intent." (*People* v. *Thomas*, 25 Cal.2d 880, 901 [156 P.2d 7].)

Although the evidence was insufficient to sustain a conviction of murder in the first degree, it amply supports the implied finding of the jury that appellant was guilty of murder of the second degree. The jury were fully instructed as to the elements of murder and before the jury could have reached a verdict of first degree murder they must have found

that the killing of Mrs. Putney was done by appellant with malice aforethought. This is true, notwithstanding the court's direction to the jury that appellant must be acquitted unless the jury found him guilty of murder in the first degree.

Appellant contends that the court committed prejudicial error when it instructed the jury that, ''Although there are two degrees of murder, the evidence in this case is such that either the defendant is innocent of the charge of murder or he is guilty of murder in the first degree.'' By what has been already said this contention must be sustained. However, we are unable to see how the instructions under the circumstances of this case worked to the prejudice of appellant. It required greater proof than would have been necessary to convict of murder of the second degree by requiring proof of a killing of an aggravated nature before any verdict of guilty could be found.

Appellant contends that the closing arguments of the prosecution were so inflammatory and so defamatory that defendant was denied his right to a fair trial. Appellant receives a certain amount of support in this respect from the respondent, who says that parts of the argument of the district attorney in closing the presentation to the jury cannot be condoned. In this we agree. The case had been fully and ably argued by associate counsel for the People who had been assigned by the Attorney General to aid the district attorney. After the close of the argument of defense counsel, the district attorney began his final argument as follows: ''May it please the Court, counsel, my worthy associate, and ladies and gentlemen. I want to tell you first, right off, that mild-mannered Mr. Smith, that is what a lot of people call me, stayed home; this is the District Attorney Gordon Smith speaking to you right now, and I will be just as mean and tough as any other attorney you have heard. There is no question about this case; we are going to talk about facts and murder, and before I am through I will show you that you have heard this morning and Friday the biggest phony you have ever heard in your life, and I am speaking of John T. Reges, and you will agree with me 100 percent; I will show you that the defense offered in this case, the defendant himself, and his attorney Mr. Reges are three peas out of the same pod; they are all phonies; it's a bum defense, and bum counsel for the defendant, and—— [At this point counsel for defense objected and the district attorney continued]: He can't take

it.'' Later on in his argument, notwithstanding the court's admonition that the district attorney confine his argument to the record and avoid personalities, that official continued: ''. . . this is the.'Reges Rigamarol,' that is what I call it, and I will show you, and I don't care how much he resents it, he lied to you not once, not twice, but three times; he gave you a big conning. . . . This man, this liar . . .'' [referring to Reges]. Again the district attorney said: ''Have you ever read Anatomy of a Murder; it is fiction; it is a story of a murder a little different from ours; . . . . In this book two lawyers were talking about defense attorneys' tactics in a criminal case. Let me read you just one passage, and look at Mr. Reges and see if this doesn't fit him. 'He's like an old-time Chautauqua lecturer addressin' a full tent. All he does is roar and splutter and bawl. In my considered judgment he's a dummy and a faker. He's a man of few words, yes, but he uses them over and over. When he gets through arguing to a jury, when at last the relentless torrent of his stout boiler-plate rhetoric is turned off, all—the judge, the jury, his client, opposin' counsel—all are reduced to a state of cataleptic trance. I said arguing cases. I take that back; he never made a real jury argument in his life—all he conducts are filibusters.' Am I wrong? . . . He even got the bit . . . right out of this book . . . : 'Ah yes, this is the able little man who has come up here into the brambles to show us bumpkins some of the sly city tricks he has learned so well from experts.' So much for Anatomy of a Murder.'' There was considerable more of the same tenor and we repeat such conduct cannot be condoned. However, when the whole record is considered, we do not believe it can be said that the diatribes of the district attorney, objectionable as they were, resulted in the denying to appellant of a fair trial before the jury. The lay people who make up juries are essentially fair-minded and believe in fair play. Such arguments injected into court proceedings are as apt, or perhaps more apt, to create prejudice against than in favor of the attorney guilty of such offensive conduct.

Appellant makes various additional claims of error. He contends that he was first arrested under federal process and that the federal charges were dropped for the obvious purpose of turning him over to California authorities for state prosecution and that this constituted an illegal obstruction of federal functions. He contends that the grand jury proceedings leading up to his indictment were faulty; that the indictment

returned was not found, endorsed and presented as prescribed by California laws; that he was indicted without reasonable or probable cause; that the trial court abused its discretion in denying his motion for a change of venue; that there was no proof of the corpus delicti; that the trial court erred in failing to grant his motion for a mistrial based upon the conduct of the district attorney; and that the trial court committed various errors in instructions given and in instructions requested and refused. We have examined these assignments of error and find them to be either without merit or nonprejudicial. We think it unnecessary to discuss them in detail. Some of them we have already discussed, for instance, the error in instructing the jury that the evidence was such that the defendant was either innocent or guilty of first degree murder and the failure of the court to instruct on second degree murder.

Section 1181, subdivision 6, of the Penal Code provides that:

"When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, . . . the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial, and this power shall extend to any court to which the cause may be appealed."

We believe this a proper case to exercise the power of modification and affirmance.

For the reasons above stated the judgment is modified by reducing it to murder of the second degree and as so modified is affirmed. The cause is remanded to the trial court with directions to pronounce judgment on defendant sentencing him to imprisonment in a state prison for the term prescribed by law for second degree murder.

Peek, J., and Schottky, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 8, 1961. Schauer, J., was of the opinion that the petition should be granted.